In re IKON OFFICE SOLUTIONS, INC. SECURITIES LITIGATION.

Andrew J. Karcich, Custodian for Andrew J. Karcich–UGMA NJ, Plaintiff,

v.

John E. Stuart, et al., Defendants.

No. CIV.A. 99–5759.

United States District Court, E.D. Pennsylvania.

May 9, 2000.

Todd S. Collins, Berger & Montague, P.C., Philadelphia, PA, Patrick Slyne, Stull Stull & Brody, New York, NY, Stuart H. Savett, Savett Frutkin Podell & Ryan, Philadelphia, PA, Jerome M. Congress, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, Lynn Lincoln Sarko, Keller Rohrback, LLP, Seattle, WA, for Class Plaintiffs.

Jerold B. Hoffman, Hoffman & Edelson, Doylestown, PA, for Derivative Plaintiffs.

Brian D. Roche, Sachnoff & Weaver, Ltd., Chicago, IL, for Defendants in Whetman and Wallis Actions.

Lawrence T. Hoyle, Jr., Arlene Fickler, Hoyle, Morris & Kerr LLP, Philadelphia, PA, for Defendant John E. Stuart.

Edward M. Posner, Drinker Biddle & Reath, Philadelphia, PA, Marc Gary, Mayer,

Brown & Platt, Washington, DC, for Defendant Ernst & Young, LLP.

Ron Kilgard, Dalton Gotto Samson & Kilgard P.L.C., Phoenix, AR, E. Graham Robb, Weber Goldstein Greenberg & Gallagher, Philadelphia, PA, David K. Isom, Salt Lake City, UT, for Whetman (Utah) Plaintiffs.

Roger H. Hoole, Hoole & King, Salt Lake City, UT, for Wallis (Nevada) Plaintiffs.

Thomas G. Rafferty, Cravath, Swaine & Moore, New York, NY, John G. Harkins, Jr., Eleanor Morris Illoway, Harkins Cunningham, Philadelphia, PA, for Defendants Ikon Office Solutions, Inc., James J. Forese, Kurt Dinkelacker and Michael J. Dillon.

Benjamin E. Baker, Jr., Hogan Smith & Alspaugh, P.C., Birmingham, AL, for Objector Hogan, Smith & Alspaugh.

### MEMORANDUM & ORDER

KATZ, Senior District Judge.

The parties have requested approval of two settlements. The first is a partial settlement of a securities class action for $111 million; class counsel seeks thirty percent of this fund as attorneys' fees. The second is a complete settlement of a related derivative suit for $5 million, which will be contributed to the class action fund. Attorneys' fees for the derivative suit would come from the amount awarded to class counsel. After a fairness hearing on April 11, 2000, the court grants all of these requests and issues a final judgment and order under Rule 54(b) of the Federal Rules of Civil Procedure.

I. Introduction

 A. Background and Underlying Allegations

 1. *In re Ikon*

Ikon Office Solutions, Inc., is the successor to Alco Standard Corporation. Alco had two primary businesses. The first included sales and leasing of document imaging equipment, document management, and related services; the second was a paper supply and packaging systems distribution business. As of January 1, 1997, Alco spun off the paper and packaging business to shareholders under the name of Unisource Worldwide, Inc. and changed its own name to Ikon Office Solutions, Inc. Alco stock was traded on the New York Stock Exchange, and Ikon stock is still traded there.

During the period at issue, Ikon embarked on an aggressive strategy of integrating numerous individually operating copier dealers and related businesses in a so-called "transformation initiative." Ikon acquired more than 200 companies, purchasing many primarily with Ikon stock. While the parties disagree on the exact source and scope of the financial difficulties that soon followed, the incorporation of these companies into the Ikon network clearly did not proceed smoothly. On August 14, 1998, Ikon announced that it was taking a $110 million charge against earnings, $94 million in the third fiscal quarter of 1998, and $16 million against the previously reported second fiscal quarter earnings, which were restated. This charge had several components: a write-down of accounts receivable, charges with respect to lease defaults, breakdowns in the execution of internal controls, loss from an asset impairment in a technologies services company, and adjustments at numerous operating units. Ikon stock declined at the time of the Unisource spin-off and traded through most of 1997 and the first half of 1998 at a range of $20.00 to $30.00 per share. At the end of the first half of 1998 and into the second half, it began falling steadily, reaching about $10.00 a share. After the charge to earnings, it fell even farther.

The charge to earnings and subsequent decline in stock price led to the present litigation. Fourteen actions were filed in the Eastern District of Pennsylvania, and, on October 20, 1998, this court consolidated those and subsequent actions. On November 30, 1998, the court approved a proposed structure for lead plaintiffs[1] and lead counsel[2] submitted by plaintiffs' counsel.

---

1. This stipulation appointed Randy and Judith Leach, the City of Philadelphia through its Board of Pensions and Retirement, Oliver Scofield, Dan Watson, Frederick Goldfein, Stanley Knapp, Lawrence Porter, and Gerard Galiger as lead plaintiffs.

2. Berger & Montague, P.C.; Keller Rohrback, L.L.P.; Milberg Weiss Bershad Hynes & Lerach,

Plaintiffs filed their Consolidated Class Action complaint on December 19, 1998. This complaint asserted violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5. The complaint named as defendants Ikon itself, as well as John Stuart, Kurt Dinkelacker, James Forese, and Michael J. Dillon, who were all members of Ikon's senior management.[3] For purposes of this memorandum, these parties will be referred to as the "Ikon defendants" or the "settling defendants." The complaint alleged that defendants engaged in a fraudulent scheme to falsify Ikon's financial results and to issue aggressive financial projections for which defendants lacked a reasonable basis. Plaintiffs focused on allegedly materially false and misleading financial statements regarding Ikon's revenue and income; the utilization of accounting devices such as understatement of reserves for doubtful account receivables, obsolete inventory and lease defaults; recognition of revenue based on the improperly inflated value of leased equipment; and recording of revenue from lease transactions that had not actually taken place. Plaintiffs also alleged that Ikon's senior management deliberately pressured lower level management to issue reports with inflated results. According to the complaint, this led Ikon business units improperly to reduce reserves, accrued payables, and other accounts in violation of generally accepted accounting principles (GAAP), all of which artificially inflated earnings and income. Plaintiffs contended that these fraudulent practices enabled Ikon to overstate its income during the class period, described subsequently, by at least $110 million, and concurrently to inflate its securities.

On March 15, 1999, the court approved the parties' stipulation certifying the following class pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3):

All persons who purchased or otherwise acquired common stock and/or call options of Alco Standard Corp., and/or Ikon Office Solutions, Inc. during the period from January 1, 1997 through and including August 13, 1998; or "when issued" common stock of Alco Standard Corp. during the period from December 9, 1996, through and including December 31, 1996; or convertible preferred stock of Alco Standard Corp. and/or Ikon Office Solutions, Inc. during the period from December 16, 1996 through and including August 13, 1998. Excluded from the Class are defendants, the officers and directors of Ikon, members of the immediate families of such officers and directors, and subsidiaries and affiliates of the defendants (the "Certified Class").[4]

Order of Mar. 15, 1999 ¶ 1.

In late June 1999, plaintiffs filed an Amended Consolidated Class Action Complaint alleging 10(b) violations against the accounting firm Ernst & Young (E & Y). This Amended Complaint also included claims against Ikon and the individual defendants brought under sections 11 and 12(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, based on alleged errors and misrepresentations contained in the May 1997 Registration Statement. In August 1999, the court permitted the plaintiffs to file a Second Amended and Consolidated Complaint that added section 11 allegations against E & Y based on its role in the May 1997 Registration Statement. E & Y served as Alco's independent outside accountant and continued in that role for Ikon. As of January 1997, E & Y also assumed responsibilities for

---

L.L.P.; and Stull, Stull & Brody were named as co-lead counsel, and Savett, Frutkin, Podell & Ryan, P.C., was named as liaison counsel.

**3.** Until July 9, 1998, Stuart was the Chairman of the Board of Directors, President, and CEO. From July 9, 1998, Forese has been President, CEO, and a member of the Board of Directors. Before July 9, 1998, he was Executive Vice–President and President of International Operations. Dinkelacker was a member of the Board of Directors. Also, before April 1997, he served as President, Chief Operating Officer, as well as a member of the Board of Directors; in April 1997, he became Executive Vice President and CFO. Dillon was the Vice President, Controller, and Chief Accounting Officer. *See* Compl. ¶ 7; Answer ¶ 7.

**4.** Subsequently, the plaintiffs moved to expand the certified class by approximately one year. The court denied this motion without prejudice on May 25, 1999.

Ikon's internal audits, and most of the allegations focused on that internal role. E & Y is not a party to the proposed settlement and originally raised several objections to its terms.

Settlement negotiations commenced in spring 1999. The parties represent that, during these negotiations, plaintiffs' counsel contended that they had a strong liability case and could prove enormous damages. Defendants responded both that the liability portion of the case was weak and that Ikon could not pay the damages demanded. Consequently, plaintiffs engaged Wilbur Ross, Senior Managing Director of Rothschild, Inc., an investment banking firm, to analyze the maximum amount Ikon could pay without impairing its operations. *See* Joint Decl. of Lead Counsel ¶ 42.[5]

Settlement negotiations continued over the next several months. On November 24, 1999, this court granted joint motions for an order preliminarily approving a partial settlement between plaintiffs and the Ikon defendants, as embodied in a memorandum of understanding, and staying pretrial proceedings, including discovery between plaintiffs and E & Y, pending final approval of the partial settlement in the spring of 2000.[6] By order of December 29, 1999, the court preliminarily approved the terms of the stipulation of settlement.

### 2. The Derivative Suit

In late November 1999, an individual Ikon shareholder filed a derivative action captioned as *Karcich, Custodian for Andrew J. Karcich–UGMA, NJ, et al. v. Stuart, et al.* (hereinafter *Karcich* or the derivative suit).[7] This suit names as defendants John Stuart, James Forese, Kurt Dinkelacker, and Michael Dillon. It also names Ikon itself as a nominal defendant.

Karcich alleges that the individual defendants breached their fiduciary duties to Ikon by, *inter alia*, failing to supervise adequately Ikon operations, employees, and managers; failing to become or remain adequately informed as to the conduct of Ikon operations; failing to take action to correct improper financial practices and/or concealing, directing, or encouraging such practices; and recklessly exposing Ikon to substantial losses, including the class action, as a result of these errors. By order of December 29, 1999, the court granted preliminary approval of the proposed settlement in this action.

### B. The Terms of the Settlements

Although the two settlements are very much dependent upon one another, there are separate agreements in the two cases.

#### 1. *In re Ikon*

The settling defendants have paid into an escrow account on behalf of plaintiffs and the global class the cash sum of $111 million, which has been earning interest since January 13, 2000. Five million of the $111 million total comes from the settlement of the derivative suit, discussed in the next section. As of April 13, 2000, the account had earned approximately $841,000 in interest. The global class, which is the certified class plus the settlement class, is defined as:

a. all persons who purchased or otherwise acquired common stock, convertible preferred stock, and/or call options of Alco Standard Corp. and/or IKON during the period from January 24, 1996 through and including August 13, 1998, other than the members of the Certified Class who do not timely exclude themselves from the Settlement Class; and

b. all persons who excluded themselves from the Certified Class but who, pur-

---

**5.** At the fairness hearing, counsel stated that Mr. Ross had not prepared a written report.

**6.** In December 1999, several other cases were transferred and consolidated with *In re Ikon* by the Judicial Panel on Multi–District Litigation (JPMDL). Some of the plaintiffs in those transferred cases objected to portions of the settlement.

**7.** In June 1999, a different shareholder filed a derivative suit captioned as *Matly v. Stuart, et al.,* Civil Action No. 99–3038. Defendants moved to dismiss *Matly* based on plaintiff's failure to make the required demand on Ikon's independent directors. Plaintiff gave notice of voluntary dismissal on October 15, 1999, and the court denied the motion to dismiss as moot on November 4, 1999.

suant to the Settlement, request inclusion in the Settlement Class for the purpose of being able to participate in the Settlement.

*See* Preliminary Approval Order of Dec. 30, 1999 ¶ 3. The settlement provides that, following payment of attorneys' fees and reimbursement of expenses to plaintiffs' counsel, the net settlement fund, which is defined as the settlement fund plus interest minus settlement administration costs and attorneys' fees and cost reimbursement, will be distributed to global class members whose proofs of claim are approved on a *pro rata* basis as described in the plan of allocation.

In addition to the cash settlement, the settling defendants have agreed to cooperate with plaintiffs in the case against E & Y. As plaintiffs describe this obligation,

> This cooperation, which is already underway, provides for the interviews of all of the individual defendants and up to 12 current IKON employees selected by plaintiffs. Further, these individuals are required, upon request of plaintiffs' counsel, to execute appropriate written statements accurately reflecting their knowledge of pertinent, non-privileged facts and to accept trial subpoenas to appear as witnesses at any trial against E & Y. IKON has also agreed to cooperate with plaintiffs' counsel concerning the authentication of documents, and the production of potentially useful documents not yet in the possession of plaintiffs' counsel.

Joint Decl. ¶ 48; *see also* Stip. and Agmt. of Settlement ¶ 10 (describing nature of cooperation).

Upon court approval of the settlement, plaintiffs and global class members will release all claims against the settling defendants and related parties, excluding E & Y, that were or could have been asserted in this litigation. For these purposes, the release contained in the final order of judgment defines "settled claims" as follows:

> [A]ll claims, demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, asserted or that might have been asserted, including, without limitation, claims for negligence, gross negligence, fraud, negligent misrepresentations, breach of fiduciary duty, or violations of any state or federal statutes, rules or regulations, by any Lead Plaintiff or Global Class member against Settling Defendants or Released Parties arising out of, relating to, or in connection with purchases or acquisitions by any other means, directly or indirectly, of IKON Securities at prices which are alleged to have been wrongfully inflated during the Class Period from January 24, 1996 through and including August 13, 1998—or arising out of or relating to any of the acts, omissions, misrepresentations, facts, events, matters, transactions or occurrences referred to in any of the complaints filed in the Litigation or the Derivative Action or otherwise alleged, asserted or contended in the Litigation or Derivative Action as having wrongfully inflated the market price of IKON Securities; provided however, Settled Claims shall not include: (a) any claim that, in connection with a Global Class member's sale of his or her business to IKON in return in whole or in part, for securities, IKON breached its contract with the Global Class member by failing to perform any of its obligations, except that a claim alleging that there was a wrongful inflation of the price of IKON Securities is a Settled Claim; (b) any claim that IKON or other Released Parties violated duties to any IKON employee who is a Global Class member, except that such claims are Settled claims insofar as the injury alleged is that the Global Class member or a trust or other ERISA related entity of which the Global Class member is a beneficiary or participant was caused to acquire or did acquire, directly or indirectly, IKON Securities at wrongfully inflated prices during the Class period; and (c) any claims, demands, rights, liabilities, and causes of action, of any nature and description whatsoever, that are asserted or that could have been asserted by a Lead Plaintiff or Global Class member against Ernst & Young LLP, or any of its predecessors, successors, affiliates, partners, principals, or employees.

Final Judgment of Dismissal with Prejudice as to Certain Defendants ¶ 6.[8]

In addition, the settlement provides that class counsel may seek attorneys' fees of up to thirty percent of the settlement fund and costs up to $3.9 million.

### 2. The Derivative Action

The Ikon settlement is also contingent upon court approval of the proposed settlement in the derivative suit. This settlement provides for Reliance Insurance Company to deposit $5 million dollars on behalf of the individual defendants into the settlement fund established for the Ikon securities actions. Essentially, the individual defendants have made their liability insurance policies payable to Ikon, thus reducing the amount that the corporation will pay. The settlement also provides that derivative counsel may request up to twelve percent of the derivative settlement amount, including interest, in addition to expenses.

### C. The Fairness Hearing

On April 11, 2000, the court held a fairness hearing on the proposed settlements. Counsel for the settling parties in the securities action outlined the terms and plan of allocation. The court then heard from five objectors: the so-called ERISA plaintiffs in *Whetman v. Ikon Office Solutions, Inc.*, a case consolidated with *In re Ikon* by the JPMDL's order; James and Darin Wallis, plaintiffs in *Wallis v. Ikon Office Solutions, Inc.*, another consolidated case; non-settling defendant E & Y; John Guest and Bryan Chapman; and the Hogan, Smith, Alspaugh, Samples & Pratt, P.C. Profit Sharing Retirement Plan (hereinafter HSA).[9] The court granted uncontested motions to intervene submitted by Guest and Chapman and HSA. *See* Orders of April 11, 2000. The parties in the derivative suit also summarized the terms of that settlement, to which there were no objectors.

### II. *In re Ikon*

▮ "The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank*, 55 F.3d 768, 784 (3d Cir. 1995). Nonetheless, the court has an obligation to ensure that class members' interests have been protected. Before approving a settlement, the court must examine whether adequate notice was issued to prospective class members. *See* Fed.R.Civ.P. 23(c)(2). The court must also determine whether a settlement class is properly certified under Federal Rules of Civil Procedure 23(a) and (b)(3). Finally, the court must decide whether the proposed settlement itself is fair to settling parties and relevant third parties. *See* Fed.R.Civ.P. 23(e). Although the court may acknowledge that the proposed class is a settlement class, it may not even reach the fairness question if there is not a proper class and may not substitute the fairness inquiry for the Rule 23(a) and (b) inquiry. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620–21, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re Prudential Ins. Co. of Amer. Sales Practices Litig.*, 148 F.3d 283, 308 (3d Cir.1998).

### A. Adequacy of Notice

▮ "In order to satisfy due process, notice to class members must be 'reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *Lachance v. Harrington*, 965 F.Supp. 630, 636 (E.D.Pa.1997) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). This determination must be made before inquiry into the merits is proper. *See In re Prudential*, 148 F.3d at 326–27; *Lachance*, 965 F.Supp. at 636; *see also* Fed.R.Civ.P. 23(e) (barring settlement of class action unless proper notice is made).

---

**8.** Virtually identical language is found in the Notice of Pendency of Class Action, Proposed Settlement, and Hearing Thereon, *see* ¶ 25, by which notice of the proposed settlement was disseminated to class members, and in the Stipulation of Settlement, *see* ¶ 1.19. The Notice is discussed in more detail subsequently.

**9.** A sixth objection was withdrawn. *See* Order of Apr. 10, 2000 (filing correspondence).

In 23(b)(3) actions, class members must receive " 'the best notice practicable under the circumstances,' " including individual notice to all shareholders who can be identified through reasonable effort. *Lachance*, 965 F.Supp. at 636 (quoting Fed.R.Civ.P. 23(c)(2)).

■ The notice provided met the requirements of due process and the Rules of Civil Procedure. In July 1999, plaintiffs' counsel mailed more than 140,000 copies of a Notice of Pendency of Class Action and Request for Exclusion and published a Summary Notice of Pendency of Class Action. Only about 2,500 requests for exclusion were received following this dissemination. *See* Aff. of D. Lee Janvrin (Apr. 10, 2000) ¶ 7.[10] In January 2000, plaintiffs mailed more than 170,000 notices entitled Notice of Pendency of Class Action, Proposed Settlement and Hearing Thereon ("Settlement Notice"), and Proofs of Claim and Release forms to individuals who purchased common stock, convertible preferred stock, or call options of Ikon or Alco from January 24, 1996, through and including August 13, 1998. *See* Aff. of Cheryl Washington (Mar. 7, 2000) ¶ 3[11]; Janvrin Aff. (Apr. 10, 2000) ¶ 3. In response to inquiries or correspondence, more than 75,000 additional Settlement Notices and claim forms were mailed. *See* Janvrin Aff. (Apr. 10, 2000) ¶ 5. In addition, the plaintiffs published a Summary Notice in the *Wall Street Journal* National Edition on January 25, 2000. *See id.* ¶ 6.

The substance of the Settlement Notice was also adequate. It contained a detailed explanation of the settlement terms, including estimates of potential recovery if the action were to proceed to trial and counsel's reasons for proposing the settlement. The potential maximum request for attorneys' fees was included, as were the names and contact information of relevant attorneys. The proposed release was reproduced verbatim, as was the plan of allocation. Similarly, the Summary Notice gave the essential terms of the settlement and information on how to acquire the full notice.

**B. Class Certification**

■ The parties seek to certify this settlement class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). Class actions are particularly appropriate in cases alleging securities fraud, *see, e.g., Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir.1985), and this settlement class easily meets the certification requirements. The court makes no comment as yet on the status of any class action against non-settling defendant E & Y.

### 1. Rule 23(a)

Rule 23(a) requires a showing of numerosity, commonality, typicality, and adequacy of representation.

#### a. Numerosity

■ To be maintained as a class action, the class must be so "numerous that joinder of all members is impracticable." Fed. R.Civ.P. 23(a)(1). Impracticality does not mean impossibility of joinder, and the court should make common sense assumptions on this issue. *See Moskowitz v. Lopp*, 128 F.R.D. 624, 628 (E.D.Pa.1989). There is no doubt that the settlement class meets this requirement. The parties agree that there were 135 million shares of Ikon common stock outstanding during the global class period, and, as described in the notice discussion, more than 200,000 notices were mailed to class members.

#### b. Commonality

■ Before the court may certify a class, it must find that "there are questions of law and fact common to the class." Fed.R.Civ.P. 23(a)(2). Like numerosity, this requirement has been applied liberally in securities fraud litigation, *see Moskowitz*, 128 F.R.D. at 628 (citing numerous cases), and commonality "is not defeated by slight differences in class members' positions[.]" *Id.* "A finding of commonality does not require that all class members share identical claims, and indeed 'factual differences among the claims of the

---

10. D. Lee Janvrin is an employee of the firm retained to mail the notices in this litigation. *See* Aff. ¶¶ 1–2.

11. Cheryl Washington is an employee of the same firm. *See* Aff. ¶¶ 1–2.

putative class members do not defeat certifi-cation.' " *In re Prudential*, 148 F.3d at 310 (quoting *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994)).

The plaintiffs identify several common questions: "whether the Settling Defendants made material misstatements and/or omitted material facts; whether they acted with scienter; whether IKON's stock traded in an efficient and developed market; and whether the Settling Defendants made the statements attributed to them." Plf. Mem. in Support of Final Approval of Settlement and Plan of Allocation at 13. Particularly as this factor requires only that the named plaintiffs share " 'at least one question of fact or law with the grievances of the prospective class,' " *In re Prudential*, 148 F.3d at 310 (quoting *Casey*, 43 F.3d at 56), this requirement is met.

### c. Typicality

The third requirement is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "[T]ypicality entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different ... or the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg*, 766 F.2d at 786 (quoting *Weiss v. York Hosp.*, 745 F.2d 786, 809 n. 36 (3d Cir.1984)). That is, the theories of the named plaintiffs must not be in conflict with those of the putative members. *See In re Prudential*, 148 F.3d at 311; *Baby Neal*, 43 F.3d at 57. In most cases, a plaintiff's claim is typical of a class if it arises from "the same event or course of conduct which in turn had given rise to the claims of other class members[.]" *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 139 (D.N.J. 1984) (citations omitted); *see also In re Scott Paper Co. Sec. Litig.*, 142 F.R.D. 611, 615 (E.D.Pa.1992) (same).

The typicality requirement is also met with little difficulty. There is no difference between the legal theories advanced by the plaintiffs and those of the other class members. The named plaintiffs and those they represent allege violations of the federal securities laws stemming from the same course of conduct. *See In re IGI Sec. Litig.*, 122

F.R.D. 451, 456 (D.N.J.1988) (noting that the typicality test looks to defendants' actions, rather than to those of plaintiffs). The allegedly fraudulent scheme to inflate Ikon stock price is the "linchpin" of the complaint, regardless of the relatively minor differences in the ways in which plaintiffs were injured. *In re Prudential*, 148 F.3d at 311; *see also id.* at 312 (noting that all parties would need to "demonstrate the existence of this scheme").

### d. Adequacy

■ Finally, the representative parties must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Adequacy requires an evaluation of two issues. It first "serves to uncover conflicts of interest between named parties and the class they seek to represent"; it also "tests the qualifications of the counsel to represent the class." *In re Prudential*, 148 F.3d at 312 (citations, internal punctuation omitted); *see also In re Gen. Motors Corp.*, 55 F.3d at 800 (focusing on same issues). The adequacy of representation inquiry requires special attention when addressing settlement classes. *See In re Prudential*, 148 F.3d at 308; *In re Gen. Motors Corp.*, 55 F.3d at 801. The court must consider whether class counsel has adequate experience, "vigorously prosecuted the action," and "acted at arm's length from the defendant." *In re Gen. Motors*, 55 F.3d at 801.

Both aspects of the inquiry are met here. First, no conflicts have been identified between the lead plaintiffs and those they seek to represent, and the court sees none upon its own examination. While, as has been acknowledged throughout this litigation, different parties may have different measures of damages, these variations are addressed in the plan of allocation, described subsequently. *Cf. Amchem*, 521 U.S. at 625–28, 117 S.Ct. 2231 (finding inadequacy in part because the settlement's terms created a conflict between different groups of plaintiffs); *In re Gen. Motors Corp.*, 55 F.3d at 800–01 (same).

Plaintiffs' counsel clearly possess the expertise to litigate this matter effectively. Their backgrounds are extensively documented in the submission entitled, "Plaintiff's

Compendium of Law Firm Affidavits." As these documents show, all of the co-lead attorneys have extensive experience in large class actions, experience that has enabled this case to proceed efficiently and professionally even under short deadlines and the pressure of handling thousands of documents in a large multi-district action.

These counsel have also acted vigorously in their clients' interests and have negotiated at arms' length from the defendants. Plaintiffs' counsel owes the entire class a fiduciary duty, *see In re Gen. Motors Corp.*, 55 F.3d at 801, and there is no basis for believing that they have failed in this obligation. The settlement negotiations extended over several months and resulted in a sizable cash fund. In contrast to some more questionable settlements, *see id.* at 803–04, the cooperation arrangement with the settling defendants, which is the only non-monetary result of the settlement, provides obvious, if non-quantifiable, benefits to the plaintiff class in the continuing litigation against E & Y. While the court has been favorably impressed with the professionalism with which counsel for all parties have treated this matter, there is no suggestion that this collegiality in any way compromised plaintiffs' interests or resulted in a collusive settlement. Counsel have aggressively prosecuted this case for over a year and a half, and some of the battles over discovery have been particularly hard-fought.

The only possible basis for questioning the adequacy of representation might be the attorneys' fee request which is, undeniably, very large. *See In re Gen. Motors Corp.*, 55 F.3d at 803 (acknowledging that fees might play a role in evaluating this factor). However, although the Settlement Notice sent to class members included a statement that class counsel could seek up to thirty percent of the settlement fund, no objections raised that issue in any meaningful way, and, as discussed more thoroughly subsequently, the facts of this case justify an award of that level. Also, this is not a situation in which counsel "effected a settlement that would yield very substantial rewards to them after what ... was little work." *Id.* Counsel

worked diligently and on short deadlines to recover a large sum of money.

### 2. Rule 23(b)(3)

In addition to Rule 23(a), the requirements of one of the subdivisions of Rule 23(b) must be met before a class may be certified. The parties seek certification under Rule 23(b)(3), which requires that common questions of law or fact predominate over individual questions and that the class action structure be the superior method of managing the case.

#### a. Predominance

The predominance test is "readily met" in many securities fraud actions, *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231; *see also In re Prudential*, 148 F.3d at 314 (same), as is the case here.[12] Plaintiffs' memorandum accurately states that "the Settling Defendants' alleged liability arises from their dissemination of false and misleading statements and the omission of material facts regarding IKON's business and financial results." Plf. Mem. in Support of Final Approval of Settlement and Plan of Allocation at 15–16. These issues would be central questions in any case brought by any of the plaintiffs or the putative class members, a fact that suggests strongly that common questions predominate over individual claims. *See Moskowitz*, 128 F.R.D. at 636. The same alleged misrepresentations, whether made in press releases or required filings, would be crucial in the claims of any class member, whether the member was a market purchaser of stock or had acquired stock through the sale of a business, and any plaintiff would rely on the same documents in proving his or her claim. Other common issues would be whether the defendants acted willfully, knowingly, or recklessly in omitting to state or misrepresenting any material facts; and whether the market price of Ikon stock during the class period was actually artificially inflated due to the actions alleged in the complaint.

"Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is

---

**12.** While the court may acknowledge the proposed settlement, the "potential benefits" of settlement are not in themselves relevant to this inquiry. *In re Prudential*, 148 F.3d at 314.

united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit." *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir.1975); *see also In re Penn Cent. Sec. Litig.*, 347 F.Supp. 1327, 1344 (E.D.Pa.1972) (addressing same issue). Although individual damage claims will differ depending on when and what type of stock was acquired, these issues cast no doubt on the finding of predominance. *See, e.g., Eisenberg*, 766 F.2d at 786; *In re Data Access Sys.*, 103 F.R.D. at 138–40, 142.[13]

#### b. Superiority

■ A class action must be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3). In evaluating the superiority of a class action, the court should inquire as to the class members' interest in "individually controlling the prosecution or defense of separate actions[,] . . . the extent and nature of any litigation concerning the controversy already commenced by or against members of the class," whether it is desirable to concentrate litigation of claims in this forum, and the manageability of a class action. *Id.*[14]

As in most securities suits, investors who are geographically dispersed allege to have lost varying amounts of money. Putative class members range from individual investors who have only a few shares to entities such as the City of Philadelphia through its Board of Pensions and Retirement that have a much larger stake. The realistic alternatives to a class action are many scattered suits with possibly contradictory results for some plaintiffs, and, for many more, abandonment of claims. These very issues have led the Third Circuit to acknowledge that the unique qualities of securities litigation mean

that the class action is often superior to individual suits. *See Eisenberg*, 766 F.2d at 785; *In re Data Access Sys.*, 103 F.R.D. at 142. This portion of Rule 23 "had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem*, 521 U.S. at 617, 117 S.Ct. 2231 (citations omitted). This is such a case.

The JPMDL's decision to transfer various other cases to this court for consolidated management also supports a finding of superiority, as it reinforces the conclusion that the claims are most efficiently addressed in a single forum by a single action.

### C. Fairness

■ A settlement of a class action may not be approved unless it is "fair, adequate, and reasonable." *Walsh v. Great Atl. & Pac. Tea Co., Inc.*, 726 F.2d 956, 965 (3d Cir.1983); *see also Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir.1995) (same). The Third Circuit has gone so far as to suggest that the district court must act as a fiduciary in protecting the interests of absent class members. *See In re Gen. Motors Corp.*, 55 F.3d at 785. To allow for meaningful appellate review, the district court must explain on the record its reasons for approving a class action settlement. *See Eichenholtz*, 52 F.3d at 488.

■ Relevant factors in assessing fairness are:

(1) the complexity, expense, and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement

**13.** Additionally, as plaintiffs note, because the claims asserted under section 10(b) and Rule 10b–5 are based on a fraud on the market theory, reliance is presumed, and plaintiffs need not prove awareness of any particular misstatement. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *In re Scott*

*Paper Co.*, 142 F.R.D. at 617; *Moskowitz*, 128 F.R.D. at 636.

**14.** As only a settlement class is at issue, the court need not inquire into whether a class action would be manageable at trial. *See Amchem*, 521 U.S. at 620, 117 S.Ct. 2231.

fund in light of the best possible recovery ...; (9) the range of reasonableness of the settlement to a possible recovery in light of all the attendant risks of litigation[.]

*Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975) (citations omitted); *see also In re Gen. Motors Corp.*, 55 F.3d at 785; *Eichenholtz*, 52 F.3d at 488. The proponents of settlement bear the burden of establishing that these factors support settlement. *See In re Gen. Motors Corp.*, 55 F.3d at 785.

▮ In addressing a settlement, the court must reconcile two principles that are, at least superficially, in tension. On the one hand, the court must scrupulously ensure that the proposed settlement is in the best interests of class members by reference to the best possible outcome. On the other hand, the court must not hold counsel to an impossible standard, as a settlement is virtually always a compromise, "a yielding of the highest hopes in exchange for certainty and resolution." *In re Gen. Motors Corp.*, 55 F.3d at 806; *see also Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 804 (3d Cir. 1974) (noting that the court should not turn the fairness inquiry into a full-fledged trial on the merits); *Sommers v. Abraham Lincoln Fed. S & L Ass'n*, 79 F.R.D. 571, 576 (E.D.Pa.1978) (recommending caution before rejecting settlement proposed by experienced counsel).

▮ With these principles in mind, the court turns to the proposed settlement.

### 1. Complexity and Duration

"This factor is intended to capture 'the probable costs, in both time and money, of continued litigation.'" *In re Gen. Motors Corp.*, 55 F.3d at 812 (quoting *Bryan*, 494 F.2d at 801). In the absence of a settlement, this matter will likely extend for months or even years longer with significant financial expenditures by both defendants and plaintiffs. This is partly due to the inherently complicated nature of large class actions alleging securities fraud: there are literally thousands of shareholders, and any trial on these claims would rely heavily on the development of a paper trail through numerous public and private documents. Also, the dis-

covery in this case has proved to be particularly complex because of Ikon's decentralized structure during the class period: many of the businesses purchased by Ikon had not been fully integrated, administratively or otherwise, into its system. *See* Joint Decl. ¶ 7. Finally, the extremely large sums of money at issue almost guarantee that any outcome, whether by summary judgment or trial, would be appealed. This factor thus weighs in favor of the proposed settlement.

An equally significant issue is the likely complexity of proof. Many of the allegations relate to defendants' accounting decisions, and extensive expert testimony would certainly be required on the nature of the accounting practices, the significance of various decisions in relation to GAAP, and the effect that those practices ultimately had on stock prices and the plaintiffs' finances. The difficulty of presenting these issues either in the context of a motion for summary judgment or at trial thus weighs in favor of settlement, particularly when considered in conjunction with the corresponding financial outlays by both sides.

### 2. Class Reaction

"This factor attempts to gauge whether members of the class support the settlement." *In re Prudential*, 148 F.3d at 318. Although the number of those expressing objections or choosing to opt-out of the class is some measure of the strength of the opposition, courts must be cautious about "inferring support from a small number of objectors to a sophisticated settlement." *In re Gen. Motors Corp.*, 55 F.3d at 812. This is particularly true in securities cases, as many shareholders may have such small holdings of the stock that it is imprudent to invest the time and resources to contest a settlement. *See id.; Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n. 15 (3d Cir.1993). This risk is exacerbated when notice of the class is sent simultaneously with notice of the settlement. *See In re Gen. Motors Corp.*, 55 F.3d at 812–13.

Even acknowledging these cautionary notes, the nature and number of objections to this settlement are extremely limited. Six parties filed objections to the proposed set-

tlement. Two objections primarily seek to clarify rather than to reject the settlement: the Wallis plaintiffs sought exclusion only to the extent that the settlement would unilaterally release certain claims brought in their independent action, and the ERISA plaintiffs seek clarification of the status of their "holder" claims. Two other objections are no longer at issue. E & Y's objections pertained to issues specific to its status as a non-settling defendant, which have been resolved through the submission of stipulated language, and the Gill and Campbell objections were withdrawn prior to the fairness hearing. Only two remaining objections deal directly with the proposed settlement, and they address relatively peripheral aspects. No large institutional investor has objected to the proposed settlement, and there have been few opt-outs given the size of the class. *See* Janvrin Aff. (Apr. 10, 2000) ¶ 7 (stating that 2,324 timely requests and 238 untimely requests for exclusion were received from the certified class following the July Class Action Notice); Joint Decl. ¶ 82 (stating that only two persons have since sought exclusion from the global class). This factor also weighs in favor of approval.[15]

### 3. Stage of the Proceedings and Amount of Discovery Completed

■ A settlement should not be approved if the parties do not have an " 'adequate appreciation' " of the merits of the case. *In re Prudential,* 148 F.3d at 319 (quoting *In re Gen. Motors Corp.,* 55 F.3d at 813). Consequently, the type and amount of discovery that has occurred since the commencement of the action are relevant to the propriety of settlement.

Counsel have invested sufficient time and attention to the merits of the case to have a reasoned opinion of its settlement value as well as whether settlement is even the prudent course of action. The Joint Declaration of Lead Counsel outlines the discovery and factual investigation conducted thus far. Obviously, class counsel reviewed defendants' SEC filings, securities analysts' reports, press releases, and other public documents. They also sought out former Ikon employees who would provide information about the al-

legations against the settling defendants. Plaintiffs served five document requests and four sets of interrogatories on defendants and moved unsuccessfully for unlimited extension of the interrogatory and deposition limits contained in the Federal Rules of Civil Procedure. *See* Joint Decl. ¶¶ 19–20.

Settling defendants eventually produced over two million pages of documents. To manage this information while minimizing duplication, class counsel established a computerized document retrieval system and organized document review by teams of attorneys. *See id.* ¶¶ 21–22. Counsel also eventually obtained documents from Ikon business districts after concluding that the materials at Ikon's headquarters were insufficient. *See id.* ¶ 23. Plaintiffs acquired the following items: minutes of Ikon boards of directors and committee meetings, internal communications between senior management, communications between Ikon and E & Y personnel, extensive financial reports, budgeting and forecasting documents, documents related to the "transformation initiative" and internal controls and audits, internal accounting materials, individual customer files, files for Ikon acquisitions during the global class period, documents regarding communications between Ikon and securities analysts who covered Ikon, and documents concerning Ikon sales and trends. *See id.* ¶ 24.

Counsel conducted over thirty-five depositions of Ikon personnel in an extremely short time and served subpoenas on many nonparties. One such subpoena led to plaintiffs' request to include E & Y as a defendant. *See id.* ¶¶ 27–28. Plaintiffs also retained experts in forensic accounting to review documents produced by the settling defendants, particularly to evaluate compliance with GAAP and to calculate damages and the plan of allocation.

This is not a situation in which plaintiffs' counsel have conducted only cursory investigation or have otherwise failed to consider the ramifications of settlement; the fact that counsel claim over 45,000 hours of time on this matter, which has been before this court

---

**15.** The substance of the objections is addressed subsequently.

for more than a year and a half, strongly suggests that they are well-informed on the merits of settlement versus continued litigation. While the parties' willingness to reach agreement on certain issues (for example, the early stipulation of a class) has streamlined this proceeding, the parties sought court assistance on several occasions, most notably on contentious discovery matters of great significance to the course of the litigation. *Cf. In re Gen. Motors*, 55 F.3d at 813–14 (finding this factor weighed against approval because counsel submitted the settlement only four months after filing the consolidated complaint and without conducting discovery on the merits of the case or retaining experts).

### 4. Risks of Maintaining the Class Action through Trial

 "The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits. Thus, the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the action." *In re Gen. Motors Corp.*, 55 F.3d at 817. While decertification is always a possibility given the conditional nature of all class certifications, decertification would have been extremely unlikely for the second half of the settlement class period given the strong congruity of issues and legal theories. However, the court denied without prejudice a motion to certify a class for the first half of the settlement class period, and the plaintiffs acknowledge that proof of wrongdoing is generally weaker for that period. This issue weighs in favor of settlement, as settlement eliminates any remaining uncertainty as to the earlier period.

### 5. Risks of Establishing Liability and Damages

These inquiries "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential*, 148 F.3d at 319. For example, if it appears that further litigation would realistically risk dismissal of the case on summary judgment or an unsuccessful trial verdict, it is in the plaintiffs' interests to settle at a relatively early stage. In contrast, if it appears that liability is extraordinarily strong, and it is highly likely that plaintiffs would prevail at trial, settlement might be less prudent. On this issue, the court should avoid conducting a mini-trial and must "to a certain extent, give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action." *Lachance*, 965 F.Supp. at 638.

Plaintiffs primarily allege violations of section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder. To prevail on such claims, plaintiffs must show that the defendants made misstatements or omissions of a material fact with scienter in connection with the sale or purchase of securities. Plaintiffs would also have to demonstrate that they relied on such statements and that the reliance proximately caused injury. *See, e.g., In re Phillips Petroleum*, 881 F.2d 1236, 1244 (3d Cir.1989); *Seidman v. American Mobile Sys.*, 965 F.Supp. 612, 619 (E.D.Pa.1997); *In re Novacare Sec. Litig.*, Civ. A. No. 94–5808, 1995 WL 605533, at *6 (E.D.Pa. Oct.13, 1995). The plaintiffs asserted claims that were sufficiently specific that the settling defendants chose not to file a motion to dismiss, even though the 1995 Private Securities Litigation Reform Act (PSLRA), makes it more difficult for plaintiffs to prevail on such motions. *See* 15 U.S.C. § 78u–4(b)(1)– (3). Plaintiffs now, however, point to several issue that cast doubt on their ability to prevail at summary judgment or at trial.

The first, and probably most significant, barrier to a favorable result for plaintiffs is proof of scienter, which requires showing a mental state "embracing intent to deceive, manipulate, or defraud." *In re Phillips Petroleum*, 881 F.2d at 1244 (citations omitted). Even aside from the inherent difficulties establishing such proof, the settling defendants claim that they reasonably relied on E & Y's advice that Ikon's financial statements complied with GAAP and were not deceptive, an

argument that constitutes a strong defense. E & Y served as Ikon's independent auditor and performed most of the internal audit field work during the class period; E & Y was also influential in Ikon's decision to take the charge to earnings in August 1998. Plaintiffs cite two examples of problems they might face in prevailing on this issue. First, while plaintiffs contend that Ikon senior management encouraged district units to reduce reserves in order to report higher earnings in violation of Ikon accounting policy, the settling defendants argue that E & Y advised them that those internal policies were more conservative than GAAP required. Plaintiffs have also placed great stock on a handwritten note obtained in discovery from E & Y, which suggested that E & Y had information that defendant Dinkelacker, Ikon's CFO, was "cooking the books." However, plaintiffs now state that some witnesses have testified that subsequent investigation did not support this allegation.

Plaintiffs also stress that the settling defendants directly challenge the allegation that they issued deceptive financial statements. The global class period begins in January 1996 and continues into August 1998, but the settling defendants contend that there were no material errors in any Ikon financial statements until at least April 22, 1998, when Ikon announced its earnings for the second quarter of FY 1998. Defendants would and do argue that, upon learning that certain districts had significant accounting problems, Ikon embarked on a special investigation in the spring and summer of 1998. Following that investigation, E & Y required only restatement of fiscal second quarter earnings and a special charge in the third quarter of FY 1998. That is, notwithstanding an investigation into the very issues that are the subject of this litigation, Ikon's independent auditor found no need to restate any earlier financial statements.

Finally, most of the allegations against the settling defendants pertain to GAAP violations contained in various public statements and filings. Plaintiffs concede these standards are somewhat flexible and that their application requires judgment calls. Defendants can argue that a subsequent difference in opinion that led E & Y to require restatement does not necessarily mean that earlier actions were wrongful.

Plaintiffs do not specifically address the section 11 and 12(2) claims brought under the 1933 Act, noting that the core of their case addresses section 10(b) and Rule 10(b)–5 violations, but defendants contend that these claims are unlikely to succeed because they rest on the incorporation in a May 1997 Registration Statement of the 1996 fiscal year-end audited financials and the unaudited financials for the first two quarters of fiscal 1997. Defendants argue that there is no evidence that those statements were materially misstated, and that even if the plaintiffs could establish liability for the 1933 Act claims, recovery would be limited to those who acquired stock pursuant to the May Registration Statement prospectus, as 12(2) does not apply to secondary market transactions. *See Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 566, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); *Ravenna v. Integrated Food Tech. Corp.,* Civ. A. No. 99–524, 1999 WL 740384, at *2 (E.D.Pa. Sept.15, 1999). Settling defendants also note that section 11 claims are limited to initial offerings. *See, e.g., Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 286 (3d Cir.1992).

The next issue is the risk of proving damages. Damages would have been aggressively contested at trial, and plaintiffs' likely recovery, even assuming they prevailed on the liability issues, is speculative. In a 10(b) action, the measure of actual damages is the "out-of-pocket loss measured by the difference between the fair value of what the plaintiff received and the fair value of what ... would have [been] received had there been no fraudulent conduct." *Lachance,* 965 F.Supp. at 643; *see also In re Computron Software, Inc.,* 6 F.Supp.2d 313, 319–20 (D.N.J.1998) (describing methods of proving damages); *Seidman,* 965 F.Supp. at 620 (noting difficulties of proof).

Plaintiffs have identified at least two potential difficulties in proving damages. First, the decline in stock prices may have been influenced by factors other than the revelation of the alleged fraud; second, allegedly fraudulent conduct may not have been the

only factor increasing the stock price during the global class period. As plaintiffs concede, the decline in Ikon's stock prices occurred throughout much of the global class period and was not confined to the period after the charge to earnings. Consequently, the relationship between the price decline and defendants' conduct would have been hotly contested, and the outcome of this dispute is difficult to predict. *See, e.g., Blackie,* 524 F.2d at 909 & n. 25 (noting that drop in price following corrective release is not the only way to measure inflation); *Burger v. CPC Int'l, Inc.,* 76 F.R.D. 183, 188 (S.D.N.Y. 1977) (stating that risk that defendants could point to other factors besides disclosure that caused decline supported settlement). The parties also differed widely in their damage estimates. Plaintiffs have consistently maintained that damages are more than $1 billion[16]; defendants contend that damages are, at most a "few" hundred million. On both the causation and the estimate of damages, the parties would have to submit expert testimony. Regardless of the strength of plaintiffs' position, a jury might reject their expert witnesses. *See, e.g., In re Computron,* 6 F.Supp.2d at 320; *In re Novacare,* 1995 WL 605533, at *6–7. The settlement avoids this uncertainty.

In the end, the court agrees with the defendants' summation of the situation: plaintiffs' ability to prove section 10(b) and Rule 10(b)–5 liability is strongest for the later portion of the class period, and the damages would likely be less than plaintiffs' most optimistic estimates. The other causes of action would be extremely difficult to win in the early portions of the class period. These factors support the settlement.

### 6. Defendants' Ability to Withstand Greater Judgment

There is little specific information on this issue. According to the plaintiffs, settling defendants could not pay a greater amount in light of Ikon's financial distress and the fact that the relevant insurance policies constitute wasting assets insofar as defense costs are taken from them. However, no specific documentation has been presented in support of these contentions; nor has there been material submitted regarding the status of the individual defendants. The court acknowledges the settling defendants' contention that a verdict much larger than that paid out in this settlement could have forced the Ikon into bankruptcy. *See* Def. Mem. in Support of Settlement at 15. Also, class counsel represented that they retained forensics accountants to assist them in calculating a settlement that reasonably compensated class members without sending Ikon into bankruptcy. *See* Joint Decl. ¶¶ 79–81. Nonetheless, given the lack of documentary evidence, this factor weighs only slightly in favor of settlement.

### 7. Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation

"In order to assess the reasonableness of a proposed settlement seeking monetary relief, 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.'" *In re Prudential,* 148 F.3d at 322 (quoting *In re Gen. Motors Corp.,* 55 F.3d at 806).

This settlement falls within a reasonable range. Taking class counsel's best estimate of recovery at trial if all issues were resolved in their favor, the settlement provides a recovery of approximately 5.2% of the best possible recovery for those who acquired common stock and approximately 8.7% for those who acquired convertible preferred stock. While this range appears low, several caveats are in order. First, the fact that a

---

**16.** The Settlement Notice states that the lead plaintiffs estimate that the settlement will result in an average recovery of approximately $.30 per share of common stock and $1.14 per share of convertible preferred stock, assuming all eligible claimants file. *See* Settlement Notice ¶ 3. The same notice suggests that the average recovery if the case went to trial and if lead plaintiffs pre-

vailed on every issue would be approximately $5.76 per share of common stock and approximately $13.07 per share of convertible preferred stock. Defendants' estimate recovery at between $1.27 and $2.22 a share for common stock, and between $3.13 and $4.53 a share for convertible preferred stock. *See id.* ¶ 4.

proposed settlement constitutes a relatively small percentage of the most optimistic estimate does not, in itself, weigh against the settlement: rather, the percentage should be considered in light of the strength of the claims. *See, e.g., In re Sunrise Sec. Litig.,* 131 F.R.D. 450, 457 & n. 13 (E.D.Pa.1990). Second, the defendants argued that provable losses were much lower, and the settlement comprises between 13.5% and 23.6% of defendants' estimated best recovery for those with common stock, and between 25.2% and 36.4% for those with convertible preferred stock. Finally, these averages do not reflect the different proportions contained in the plan of allocation, which reimburses the strongest claims at one hundred percent of loss as defined by the settlement.

Considering the present value of the money, the probability of lengthy litigation in the absence of a settlement, the high risks that the plaintiffs would not have been able to succeed on liability, at least not for the entire period, and the likelihood the damages received would have been much lower than those demanded by plaintiffs, the settlement is a reasonable percentage of the total likely recovery at trial. Additional factors lending support to this conclusion are the non-monetizable value of the settlement's provision for cooperation between Ikon and the plaintiffs against the non-settling defendant, E & Y, and the fact that the plaintiffs were not able to "tag-along" on an investigation by an entity such as the SEC. Also, the hallmarks of a questionable settlement are not present: plaintiffs receive a significant monetary settlement as well as the non-tangible benefit of cooperation, and there is no suggestion of collusion between the defendants and plaintiffs' counsel.

### D. The Allocation Plan

"Approval of a plan of allocation of a settlement fund in a class action is 'governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.'" *In re Computron,* 6 F.Supp.2d at 321 (citations omitted). In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable. *See id.*

The present plan is reasonable. Claimants are reimbursed at various percentages for their defined losses based largely on when they bought and sold stock. The plan acknowledges that those who purchased Ikon stock in an inflated market and sold before disclosure of damaging information would have difficulty in proving damages; more difficulty, for example, than those who held their shares after the disclosures. There are three significant dates for these purposes: April 21, 1998; June 26, 1998; and August 13, 1998, each of which marks a partial disclosure. *See* 2d Am. & Suppl. Compl. ¶¶ 87–88, 94, 97. Individuals who acquired stock after January 15, 1997, and held it through any of those dates receive one hundred percent of their calculated losses in recognition of the effect of these disclosures. Individuals who bought and sold before the next such decline are "entitled to a significantly smaller Recognized Claim (typically 10% of calculated loss), because of the special difficulty of showing that any decline of the market price during the period when that investor held was caused by a partial disclosure of information that had been wrongfully concealed." Joint Decl. ¶ 53. In addition, those who acquired stock from January 24, 1996, to January 15, 1997, when the evidence of fraud is weakest and there is the greatest difficulty in class certification, are further discounted.

In addition to these time based distinctions, two other multipliers are employed for special circumstances. First, the recognized claims of those who acquired call options are multiplied by .5. Second, the recognized claims of those who acquired Ikon securities in exchange for the sale of a business to Ikon on or after May 7, 1997, are multiplied by 1.5. These individuals, unlike those who sold their business before the date of the Registration Statement, would have a much stronger section 11 claim for which they would not have to prove scienter. *See id.*

Each distinction is reasonable and accurately reflects the different risks and harms experienced by individuals who acquired

Ikon stocks at different times in different ways.

### E. Objections

Six objections to the proposed settlement were filed, one of which was withdrawn prior to the fairness hearing. The remaining five objections have either been resolved between the parties or do not cast doubt on the fairness of the settlement.

#### 1. *Wallis* Plaintiffs' Objections

James and Darin Wallis, plaintiffs in one of the cases consolidated and transferred here by the JPMDL, sold their business to Ikon in July 1995, primarily in exchange for Ikon stock. Following the sale, Ikon employed James Wallis, and he participated in the Ikon Retirement Savings Plan. James and Darin Wallis did not object generally to the proposed settlement; rather, they sought exclusion to the extent that the settlement would release either the independent claims originally brought in Nevada pertaining to the sale of their business or subsequent employment claims. The parties have since reached a stipulation memorializing their understanding of the effect of the release, *see* Stip. Regarding the Scope and Effect of the Securities Settlement on the Claims in *Wallis* (May 3, 2000), and this objection is accordingly moot.

#### 2. E & Y

Non-settling defendant E & Y originally raised four objections to the proposed settlement: three addressed the purported extinction of E & Y's contribution and related rights, one pertained to the admissibility of evidence in subsequent proceedings.[17] Counsel have since represented that the parties have agreed to language that resolves those objections. As the court finds that these revisions are appropriate, this language has been incorporated in the accompanying final judgment. *See* Final Judgment ¶ 4 (address-

ing evidentiary concerns), ¶ 11 (addressing contribution issues).

#### 3. ERISA Plaintiffs

The plaintiffs in *Whetman v. Ikon*, originally filed in Utah and transferred here by order of the JPMDL, seek a determination of the scope of the settlement's release as it affects certain ERISA claims.[18] These plaintiffs acknowledge that some claims that could have been asserted under ERISA will be released, citing, for example, certain claims under ERISA sections 404 and 406. *See* ERISA Plf. Mem. Concerning the Proposed Settlement at 4.

The ERISA plaintiffs contend, however, that the release does not include all claims that could be brought under ERISA. First, they state that the release does not include claims pertaining to Ikon stock that was acquired before the class period began and retained throughout the class period. All the parties agreed with this point at the hearing. The more contentious issue is plaintiffs' second argument, in which they maintain that the release does not cover "holder" claims even if the stock was acquired during the class period. The ERISA plaintiffs explain, "Like the claims for stock acquired before the class period began, these holder claims include claims for touting the stock, concealing the ongoing securities fraud, and, with respect to the employer match, retaining those matched funds in IKON stock instead of switching them to another fund. In other words, these claims are identical to the other holder claims except that they apply to held stock that was acquired during the securities class period instead of before." *Id.* at 5–6. The ERISA plaintiffs do not believe that they need to exclude themselves because they do not construe the release language as applying to such claims, but they ask for a ruling confirming this belief. They argue that were the settlement to include such claims, it would be unfair and unreasonable.

---

**17.** Ordinarily, non-settling defendants do not have standing to object to a partial settlement. unless "they can demonstrate that they will suffer some formal legal prejudice as a result of the partial settlement." *Eichenholtz*, 52 F.3d at 482; *see also In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1332 (3d Cir.1990) (noting same). An attempt to strip a non-settling defendant of a legal claim or

cause of action may constitute such legal prejudice. *See Eichenholtz*, 52 F.3d at 482.

**18.** These claims were discussed in more detail in *In re Ikon Office Solutions, Inc. Sec. Litig. (Whetman v. Ikon)*, 191 F.R.D. 457 (E.D.Pa.2000).

They also informally request the inclusion of the following language in the release to clarify their point: " 'Settled Claims' does not include claims, if any, for beach of fiduciary duty under ERISA based on holding IKON Securities, regardless of when those [securities were] acquired." Correspondence of Apr. 20, 2000.[19]

While the settling parties' blanket assertion that issuing any interpretation of the settlement's term would constitute an impermissible advisory opinion is overbroad,[20] the court cannot grant the ERISA plaintiffs' request for clarification. This is not a question of defining an unclear term or interpreting poorly drafted settlement language, as the settlement language is clear with respect to what claims are released: "[A]ll claims ... arising. out of, relating to, or in connection with purchases or acquisitions by any other means, directly or indirectly, of IKON Securities at prices which are alleged to have been wrongfully inflated during the Class Period." Final Judgment ¶ 6. By asking the court to issue a ruling further explaining this language, the ERISA plaintiffs effectively request a premature ruling on the res judicata or collateral estoppel effects of a settlement when these issues are not yet before the court. The facts will be developed subsequently in the ongoing *Whetman* litigation under this court's supervision; before that time, the court cannot speculate as to what specific effect this settlement will have.

The ERISA plaintiffs suggest that to approve a settlement that could release the claims they describe would be unfair, and, in support, they rely on two Supreme Court decisions, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and *Ortiz v. Fibreboard Corporation, Inc.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), in which settlements were rejected in part because of their failure to address adequately the varying interests of different subclasses. These cases are distinguishable. Both settlements arose in the unique context of asbestos-related tort claims, a particularly troublesome area of the law that has repeatedly defied class-wide resolution and that, according to the Supreme Court, requires legislative action. *See Ortiz*, 119 S.Ct. at 2302. More significantly, *Ortiz* and *Amchem* address the appropriate treatment of subclasses in class action settlements. In this case, there has never been any request for certification of an ERISA subclass or suggestion that the ERISA plaintiffs' interests are so divergent that class certification is inappropriate.

Indeed, such claims would have little merit, at least based on the present record. On this point, some comparison to *Amchem* is helpful. There, the district judge approved the proposed settlement and found that common questions predominated based on class members' shared exposure to asbestos products supplied by the defendants and their common interest in receiving prompt compensation for claims with minimal transaction cost. *See Amchem*, 521 U.S. at 622–23, 117 S.Ct. 2231. The Third Circuit and the Supreme Court rejected the settlement, finding that the class failed to meet predominance and adequacy of representation requirements under Federal Rules of Civil Procedure 23(b)(3) and 23(a)(4). While this conclusion was based partly on the uniquely "sprawling" class and partly on the obstacles to unitary resolution of various state-law claims, *see id.* at 624–25, 117 S.Ct. 2231, the most significant difficulty was that the different groups of claimants had very different interests depending on the timing of their exposure and injuries: those individuals who were already suffering from asbestos-related ailments had a profound interest in an immediate, generous payment, while those who had only been

---

19. On May 8, 2000, the Guest and Chapman objectors, discussed subsequently, joined in this objection well after the time for objections had closed. They raised no new arguments.

20. There are decisions in which the ambiguity of a settlement provision was so pronounced that it made settlement inappropriate in the absence of clarification. *See, e.g., Buchet v. ITT Consumer Fin. Corp.*, 845 F.Supp. 684, 697 (D.Minn.1994); *see also In re Jiffy Lube Sec., Litig.*, 927 F.2d 155, 161–62 (4th Cir.1991) (holding that district judge erred in approving settlement that failed to specify the legal rule governing contribution claims against a non-settling defendant); *In re Fernald Litig.*, No. C–1–85–149, 1989 WL 267039, at *7–10 (S.D.Ohio Sept.29, 1989) (construing settlement language in resolving objections).

exposed to asbestos had an equally profound but divergent interest in an inflation-protected fund from which they could recover in the future. *See id.* at 624, 626–27, 117 S.Ct. 2231; *see also Ortiz,* 119 S.Ct. at 2318–20 (noting, in context of limited fund analysis, that settlement favored known plaintiffs from earlier individual settlements to detriment of other groups). The Supreme Court also suggested that those who did not yet know of exposure or the extent of potential harm would not have the "information or foresight needed to decide, intelligently, whether to stay in or opt out." *Amchem,* 521 U.S. at 628, 117 S.Ct. 2231.

These factors are in marked contrast to the present case. Here, the class members are united not only by a generalized sense of injury and desire to resolve the matter but by the very specific nature of their claims pertaining to harm suffered as a result of artificial inflation of Ikon securities. Unlike certain participants in the *Amchem* and *Ortiz* settlements, the ERISA plaintiffs are not being penalized or functionally left out of the allocation plan: they are receiving the same compensation and measure of damages as are the other non-ERISA plaintiffs who suffered losses based on the artificial inflation of the stock prices. While counsel for the ERISA plaintiffs have repeatedly argued that ERISA claims have different measures of damages and that these claimants might be able to advance different claims pertaining to the inflation of securities, there is simply no basis for concluding that these largely unspecified claims are so unique or so divergent from those of other class members that they require a separate allocation plan or separate treatment to the extent they are released.

Nor do the ERISA plaintiffs suffer from an absence of information. To say that a class member can opt-out if the settlement is not to her liking begs the question of the settlement's fairness, but the settlement language here enables all Ikon class members to make an informed decision as to whether they want to participate and release other potential claims, including some ERISA claims.

Finally, in contrast to *Amchem,* there is no indication that the named plaintiffs in this securities action failed to operate "under a proper understanding of their representational responsibilities." *Id.* at 627, 117 S.Ct. 2231; *see also Ortiz,* 119 S.Ct. at 2318–19 (noting that some attorneys who negotiated settlement had a conflict of interest because of earlier, individual settlements). The ERISA plaintiffs do not claim that the named plaintiffs in the securities action or their counsel have shortchanged the ERISA plaintiffs in any way, and the court sees no such evidence on its own inquiry.

These issues would have been better addressed in the context of a motion for certification of a subclass or a challenge to the adequacy of representation or predominance of common issues. The ERISA plaintiffs have not made any such motions, however, and have explicitly stated that they are satisfied with the settlement fund. In the absence of more specific information, the court simply cannot conclude that the ERISA plaintiffs are being prejudiced or that their claims based on artificial inflation of stock are so different that they require a different measure of damages.

### 4. HSA

Although HSA originally filed ten separate objections to the settlement, at present, only one conditionally remains. The original plan of allocation provided that claims under $15.00 would not be paid for reasons of administrative efficiency, *see* Settlement Notice ¶ 28(f), and HSA argues that this was inappropriate, as class actions have typically paid out minimum claims of $5.00 or $10.00. *See* Aff. of L. Stephens Tilghman ¶¶ 3(a)-(b).[21] While the plaintiffs have consistently contended that a $15.00 minimum check is reasonable, they have agreed to adopt the intervenor's suggestion. *See* Correspondence of Apr. 18, 2000 (filed by Order of Apr. 19, 2000).

---

**21.** L. Stephens Tilghman is president of a "company that specializes in the administration of class action lawsuit settlements and awards."

Aff. ¶ 1; *see also id.* Ex. A (listing class action settlements for which the company has provided administrative services).

The court will accept this change in the proposed plan of allocation. While it seems doubtful that a disbursement between $5.00 and $15.00 would be particularly significant to any claimant, the affidavit originally submitted by lead plaintiffs in support of the $15.00 limit states only that costs are approximately $1.50 per check and that there are additional costs incurred in reconciling the accounts. *See* Aff. of D. Lee Janvrin re: Minimum Check Amount ¶ 4. The same affidavit notes that in three recent securities litigation actions, the minimum checks were $10.00, $10.00, and $5.00. *See id.* ¶ 3. Absent evidence that the $5.00 disbursement would be economically unfeasible or that there are other factors counseling against the intervenors' suggestion, the court sees no principled reason to require a $15.00 minimum check.

HSA indicated that it would withdraw its objections if the court were to approve this change, *see* Intervenor's Withdrawal of Objections, and this objection is accordingly moot.

### 5. Guest and Chapman

Like the HSA objectors, Guest and Chapman originally filed several objections; the court understands only two to remain.[22] The first objection pertaining to the minimum check disbursement has already been resolved. The second objection contends that the Settlement Notice impermissibly failed to inform claimants of the tax consequences of any disbursement. Guest and Chapman seek to require the inclusion of the following language in post-settlement transmittals:

> Please take notice that these settlement proceeds herein may [ ] be either taxable income or a non-taxable return of capital if the class security is still being held by the recipient as received. You should consult your own tax advisor with respect to the tax treatment.

Correspondence of Apr. 26, 2000 (filed by Order of Apr. 26, 2000).

The court will not order the inclusion of such language in subsequent correspondence and finds that the Settlement Notice properly omitted any such instructions. First, class counsel has represented that it is standard practice when distributing checks to include general notice "advising class members that they should consult their own tax advisor concerning the tax treatment of their distributions[.]" Aff. of Edward Radetich[23] ¶ 4; *see also id.* ¶¶ 5–6 (stating that providing more specific information increases risk of confusion). Second, there is no consensus as to whether the requested information is actually correct. While the objectors have included an opinion letter stating that, in some circumstances, the disbursement might be treated as a nontaxable return of capital, there are numerous caveats to that statement even in the letter. *See* Opinion Letter of O'Neill & O'Neill. All things considered, singling out one of many potential tax consequences seems more likely to create than alleviate confusion. Generic language stating that it is advisable to consult a tax specialist is preferable.[24]

### F. Conclusion

The settlement class in this securities action is properly certified, notice was properly distributed, the settlement itself is fair to all parties, and all of the objections have either been withdrawn or do not constitute a reason to reject the settlement.

## III. The Derivative Suit

 Like class actions, derivative suits may not be settled without notice and court approval. *See* Fed.R.Civ.P. 23.1. As the Third Circuit explained:

> The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative ac-

---

**22.** To the extent that others have not been withdrawn, pertaining to the amount of recovery, the plan of allocation and disbursement, and attorneys' fees, the court rejects these objections.

**23.** Edward Radetich is a CPA whose firm has handled the administration of more than 375 class action settlements. *See* Aff. ¶¶ 1–2.

**24.** The objectors also request that the court enjoin class counsel from mailing Form 1099s. The court declines to do so.

tion is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest. The adequacy of the recovery provided the corporation by the settlement must be considered in the light of the best. possible recovery, of the risks of establishing liability and proving damages in the event the case is not settled, and of the cost of prolonging the litigation.

*Shlensky v. Dorsey,* 574 F.2d 131, 147 (3d Cir.1978) (citations omitted); *see also Bell Atl. Corp. v. Bolger,* 2 F.3d 1304 (3d Cir. 1993) (applying *Girsh* factors to derivative settlements).

 As did Judge Lee in approving both a derivative suit and a securities fraud suit in *In re Chambers Development Securities Litigation,* 912 F.Supp. 822 (W.D.Pa.1995), this court stresses that it "does not review the settlement of the derivative action in a vacuum, but in conjunction with its review of the settlement reached in the main class action, of which this derivative action is merely an appendage." *Id.* at 841. As in *In re Chambers,* the settlements are inextricably connected, little has occurred independently in this litigation, and there has been no separate motion for class certification. *See id.* Consequently, the determination that this derivative settlement is reasonable and fair is made in the shadow of the securities settlement.

### A. Notice

By order of December 29, 1999, the court granted preliminary approval of the derivative settlement and directed that notice be given to Ikon shareholders. This initial notice was mailed to 52,755 Ikon record shareholders on or about January 14, 2000, and an additional 15,008 notices were mailed subsequently. *See* Aff. of D. Lee Janvrin (Mar. 7, 2000) ¶¶ 4, 6. In addition, a Summary Notice was published in the *Wall Street Journal*'s national edition on March 9, 2000. *See* Aff. of Cheryl Washington (Apr. 7, 2000) ¶ 7.[25] The Notice summarized the terms of the settlement and the bases for counsel's belief that settlement was appropriate and provided other information, such as the possible

maximum request for attorneys' fees. It also included the date of the hearing and provided information on how to submit objections. The Summary Notice provided a brief description of these facts as well.

This notice was adequate, as it reasonably provided individual notice and appropriately gave information regarding the premises of the settlement.

### B. Fairness Factors
#### 1. Complexity and Duration

Continued litigation would require significant expenditure of time and money for essentially the same reasons described in the Ikon settlement: the matters at issue are complex, document-intensive, and would require extensive expert analysis. Particularly as the likely payment for such expenses would be the defendants' insurance policies, which are also the source of recovery for this derivative settlement, prolonged litigation would hamper the plaintiff's ability to recover even the amounts at issue here.

#### 2. Class Reaction

As described previously, thousands of notices have been mailed, and summary notice was published in the *Wall Street Journal.* No objections were received either before or after the March 28, 2000, deadline. Even acknowledging that silence does not necessarily mean approval, the total absence of objections is noteworthy, and this factor weighs in favor of settlement.

#### 3. Stage of the Proceedings and Amount of Discovery Completed

Derivative counsel stress that they received access to the documents produced by the defendants in the securities litigation and that they reviewed thousands of pages of documents and deposition transcripts. It is undisputed, however, that this matter has not progressed very far, and there has been no formal discovery specific to the derivative action.

Ordinarily, this fact would probably weigh strongly against approval of the settlement.

---

**25.** Originally, this notice was to have been published on or about January 26, 2000.

"[M]ere access to the materials from other proceedings does not establish that counsel developed the merits, particularly where the other cases were premised on different theories of recovery." *In re Gen. Motors*, 55 F.3d at 814. This is especially true if the record does not demonstrate that counsel "conducted significant independent discovery or investigations to develop the merits of their case (as opposed to supporting the value of the settlements), that they had retained their own experts, or that they had deposed a significant number of individuals implicated in the materials from these other proceedings." *Id.*

Even acknowledging these warnings, the extensive materials produced in the securities litigation gave derivative counsel sufficient information to evaluate the merits of settlement in an informed manner, particularly as the court does not believe settlement requires "massive" discovery in every case. *Lachance*, 965 F.Supp. at 644. While the causes of action are different, they are very closely related and allege essentially the same behavior by the individual defendants. Derivative counsel also had a preview of the defenses that would be raised based on the motion to dismiss filed in the preceding derivative suit that was voluntarily withdrawn. Finally, the settlement in this case provides monetary relief, thus minimizing concerns over the actual value of the settlement. *See In re Gen. Motors*, 55 F.3d at 807–11. In the end, while this factor does not support settlement, it does not weigh against settlement, either, given the relationship between the derivative suit and the class action.

#### 4. Risks of Establishing Liability and Damages

This factor weighs in favor of settlement, particularly with respect to the risks of establishing liability. First, some of the difficulties discussed in the securities action are equally applicable here, such as defendants' defense of reasonable reliance on the independent auditor and the difficulties of establishing damages. There are also, however, independent barriers to establishing liability in this derivative action.

The most significant obstacle if the litigation were to continue would be the difficulty of showing that the failure to make a demand on the Board of Directors was excused, whether by futility or for some other reason. Under Ohio law, which all parties agree applies, "it is presumed that any action taken by a director on behalf of the corporation is taken in good faith and for the benefit of the corporation. The board of directors has the primary authority to file a lawsuit on behalf of the corporation." *Drage v. Procter & Gamble*, 119 Ohio App.3d 19, 119 Ohio St.3d 19, 694 N.E.2d 479, 482 (1997) (citation omitted). Shareholders may demand that the directors bring such a suit, but there is no "independent right to bring suit unless the board refuses to do so and that refusal is wrongful, fraudulent, or arbitrary, or is the result of bad faith or bias on the part of the directors." *Id.*

One exception to the demand requirement is futility. *See Drage*, 694 N.E.2d at 482; *see also Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 108–09, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (holding that federal courts should apply applicable state law to futility analysis). The complaint makes such allegations, contending that the purportedly independent directors were "dominated and controlled" by defendants Dinkelacker and Forese, Compl. ¶ 104(b), that the directors were aware of and benefitted from the misconduct, *see id.* ¶ 104(d), (g), (h), and that the Board, while "under the domination and control of defendant Forese" clearly expressed its belief that the allegations at issue had no merit. *Id.* ¶ 104(i). Plaintiff might have prevailed on these contentions. However, given the importance of the demand requirement, there would have been a significant risk that the plaintiff would have lost a motion to dismiss. *See Drage*, 694 N.E.2d at 483–86 (noting that allegations of futility because of non-defendant directors' acquiescence or domination must be pleaded in detail).

Another obstacle would have been the business judgment rule, which "presumes that in making a business decision, actions have been taken on an informed basis, in good faith, and in the honest belief that the action was taken in the best interests of the company." *Granada Investments, Inc. v. DWG Corp.*, 823 F.Supp. 448, 455 (N.D.Ohio

1993) (citations omitted); *see also Koos v. Central Ohio Cellular, Inc.*, 94 Ohio App.3d 579, 641 N.E.2d 265, 272 (1994) (noting that Ohio adheres to the business judgment rule). While this rule does not defend "self-dealing and avarice," it offers protection for officers who have taken reasonable risks in the service of their corporation. *Granada*, 823 F.Supp. at 455. The plaintiff may have been able to show that the defendant directors did not exercise due care or were unreasonably ill-informed, or that there was some personal interest at stake such that the business judgment rule would not have offered protection. *See id.* at 456. There would, however, have been significant litigation over this issue given that the alleged wrongdoing occurred in the context of a complicated, wide-ranging "transformation initiative," particularly as the directors, as in the securities litigation, would doubtless refer to their belief that E & Y's actions supported their perspective.

In short, continued litigation would have brought substantial danger to the plaintiff at every stage: the outcomes of a motion to dismiss, a motion for summary judgment, and certainly a trial, would have been in doubt.

### 5. Defendants' Ability to Withstand a Greater Judgment

The court has no information on this subject and notes that the individual defendants have paid nothing from their own pockets according to the terms of the settlement.[26] Consequently, this factor does not weigh in favor of settlement, although the court acknowledges plaintiff's representation that the liability insurance policies are wasting assets that are already partially depleted and defendants' statements that they have "scant" resources to pay any judgment.

### 6. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Risks of Litigation

The benefit derived by the corporation is the most important question in determining the fairness of a derivative settlement. In monetary terms, Ikon benefits from the derivative defendants' payment of $5 million in insurance proceeds into the $111 million settlement fund. In non-monetary terms, Ikon will benefit from the cooperation afforded by the individual defendants in the continued prosecution of the case against E & Y.[27] In light of the difficulties that would likely have attended any full-fledged suit on the merits of this case and of the continued diminution of the insurance policies, settlement of this derivative action is reasonable and in Ikon's best interests. Also, the fact that attorneys' fees in this derivative action will be paid from any fee awarded to the securities class counsel maximizes the settlement fund.

Standing alone, this settlement might well have proven inadequate. However, "[b]ecause of the intertwined nature of the derivative settlement with the main class action settlement, the Court is satisfied that they provide a thoroughly acceptable package, fair, reasonable and more than adequate to the shareholder plaintiffs class and to the corporation as real party in interest in the derivative action." *In re Chambers*, 912 F.Supp. at 843.

## IV. Rule 54 Certification

The settling parties in both *In re Ikon* and the derivative suit seek certification of a final judgment and order under Federal Rule of Civil Procedure 54(b). Ordinarily, an order terminating claims against fewer than all parties is not a final order for appeal pur-

---

**26.** According to the derivative complaint, three defendants received significant salaries and bonuses during their employment with Ikon: Stuart had a base salary of $900,000 and, in fiscal year 1996, he was paid a bonus of $900,000; Forese had a base salary of $487,500 and $425,000 in 1996 and 1997, and, in 1996, he received a bonus of $487,500; Dinkelacker had a base salary of $350,000, and, in 1996, he received a $350,000 bonus. *See* Compl. ¶¶ 11–13.

**27.** The settling plaintiff states that the enactment of other non-pecuniary procedural benefits "would have been illusory because they would only duplicate pre-existing procedures enacted by IKON since July 9, 1998, the date defendant Forese became President and Chief Executive Officer of IKON. Since that date, IKON has adopted prophylactic measures to ensure that the law is properly followed." Derivative Plf. Mem. of Law in Support of Mot. for Final Approval of Settlement at 13. The court agrees with this assessment.

poses. However, Rule 54 provides that such orders are appealable when a district court makes an "express determination that there is no just cause for delay and expressly directs entry of final judgment." *Carter v. Philadelphia*, 181 F.3d 339, 343 (3d Cir. 1999); *see also Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1208 & n. 16 (3d Cir.1991) (finding that no proper Rule 54(b) certification had been entered because district court did not comply with these requirements).

■ Such orders should be granted infrequently and not as a routine courtesy to counsel. *See Allis–Chalmers Corp. v. Philadelphia Elec. Co.*, 521 F.2d 360, 363 (3d Cir.1975). However, after weighing the "overall policy against piecemeal appeals against [the] exigencies the case present[s]," *Seidman*, 965 F.Supp. at 618 (citations omitted), it is clear that Rule 54(b) certification is appropriate here. The remaining claims against E & Y are easily separable from the issues that might be appealed in this case, such as those pertaining to the plan of allocation. There is little likelihood that subsequent events will moot out the need for appeal or that the reviewing court would have to consider the same issues more than once. *See Allis–Chalmers*, 521 F.2d at 363. While there are still claims against Ikon and other defendants in the *Whetman* case, they are distinct from those addressed here, and delay of the final judgment in *In re Ikon* would serve no purpose in resolving *Whetman*. If anything, certification of this judgment as final may assist the management of the *Whetman* claims insofar as they relate to the decisions made in approving this settlement.

Thus, as there is no reason to delay the distribution of the settlement fund, certification of the final order will serve the litigants' interest in having this issue conclusively settled and will not result in any inefficient duplication of appeal. *See Seidman*, 965 F.Supp. at 618 (approving request in similar case).

## V. Attorneys' Fees & Costs

On behalf of more than thirty law firms who have worked under the direction of the four co-lead counsel, class counsel have petitioned for an award of attorneys' fees consisting of thirty percent of the $111 million settlement fund. This would lead to counsel fees of approximately $33.5 million. Functionally included in this petition is derivative counsel's fee request, which seeks twelve percent of the $5 million derivative settlement but which would be paid from the thirty percent awarded to class counsel.

### A. Costs

Ikon class counsel seek reimbursement for litigation expenses of $3,525,497.86.[28] *See* Mem. of Law in Support of Joint Pet. for Fees and Reimbursement of Expenses at 2; Aff. of Jacob Goldberg, Ex. A (updating costs through March 25, 2000).[29] The Settlement Notice stated that counsel could seek reimbursement of expenses up to $3.9 million, and no objections have been filed either to that level or to the specific expenses claimed.

■ "There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of ... *reasonable* litigation expenses from that fund." *Lachance*, 965 F.Supp. at 651. While the expenses requested in this case are high, the court concludes that they are reasonable and should be reimbursed. Counsel for each firm has submitted an affidavit attesting to the unreimbursed expenses paid out, and the court sees no reason to disallow any particular category or claim.

### B. Attorneys' Fees for Class Counsel

■ As with every other component of a class action settlement, fee petitions must be thoroughly reviewed for fairness. Nonetheless, there is no doubt that attorneys may properly be given a portion of the settlement fund in recognition of the benefit they have bestowed on class members. *See Lachance*, 965 F.Supp. at 646. The ultimate decision as

---

**28.** An additional $300,000 in expenses were associated with mailing notice have already been reimbursed.

**29.** The costs of derivative counsel are included in this amount.

to the proper amount of attorneys' fees rests with the sound discretion of the court. *See, e.g., In re Computron,* 6 F.Supp.2d at 321.

There are two methods for calculating attorneys' fees: the lodestar method and the percentage method. Under the lodestar, the court determines fees by multiplying the number of hours spent on the litigation by an appropriate hourly rate. *See, e.g., Lachance,* 965 F.Supp. at 647. This method is most commonly used in statutory fee-shifting schemes to reward attorneys for engaging in socially useful litigation. It is also applied when the type of recovery does not allow easy calculation of the settlement's value. *See In re Prudential,* 148 F.3d at 333. The lodestar has come under attack recently, however. It may encourage attorneys to delay settlement or other resolution to maximize legal fees, and it places a great deal of pressure on the judicial system, as the courts must evaluate the propriety of thousands of billable hours. *See id.;* Third Circuit Task Force on Court Awarded Attorney Fees, 108 F.R.D. 237, 246–49 (1985). The lodestar may also compensate attorneys insufficiently for the risk of undertaking complex or novel cases on a contingency basis.

These flaws have led to the increased use of the percentage method, which permits courts to reward success and penalize failure more directly. *See In re Prudential,* 148 F.3d at 333. It is particularly appropriate in "common fund" cases such as this one, as it simply awards counsel some percentage of the settlement fund. *See Lachance,* 965 F.Supp. at 647. Also, this method theoretically aligns the interests of counsel and class more closely than does the lodestar method: a larger recovery with fewer hours expended benefits all parties. For these reasons, the Third Circuit has "now made it clear that district courts should apply the [percentage] method of calculating fees in common fund cases such as this one." *Id.* (citing *In re*

*Gen. Motors,* 55 F.3d at 821–22). Among its other commendable qualities is that it makes the number of attorneys involved in the case irrelevant. *See, e.g., In re U.S. Bioscience Sec. Litig.,* 155 F.R.D. 116, 118 (E.D.Pa. 1994).

■ In light of these considerations and the fact that this is a "paradigmatic common fund case," *In re Chambers Dev. Sec. Litig.,* 912 F.Supp. 852, 860 (W.D.Pa.1995), the court will apply the percentage method, cross-checked against the lodestar. *See Prudential,* 148 F.3d at 333; *Computron,* 6 F.Supp.2d at 322. The percentage will be based on the net settlement fund after deducting the costs of litigation, as this approach increases the incentives for cautious expenditure and, again, helps align the interests of the class more closely with those of counsel. *See Lachance,* 965 F.Supp. at 647–49; *see also Blackman v. O'Brien Envtl. Energy, Inc.,* Civ. A. No. 94–5686, 1999 WL 397389, at *1 (E.D.Pa. May 12, 1999) (following *Lachance* in calculating percentage fee award on net rather than gross settlement). Subtracting the approved expenses of $3,825,497.86 from the gross settlement fund leaves a net settlement fund of $108,915,-874.43. Thirty percent of that amount is $32,404,744.33.

■ The question is whether thirty percent is the appropriate percentage for class counsel.[30] This determination is somewhat elastic and depends largely on the facts of a given case, but certain factors are commonly considered. Specifically, the court may address the percentage likely to have been negotiated between private parties in a similar case, percentages applied in other class actions, the quality of class counsel, and the size of the award. *See, e.g., In re Prudential,* 148 F.3d at 339[31]; *In re Computron,* 6 F.Supp.2d at 323–24; Third Circuit Task Force, 108 F.R.D. at 256.

---

**30.** Actually, the first step is to value the settlement. *See In re Gen. Motors,* 55 F.3d at 822. Here, the primary value of the fund is readily ascertainable at its dollar amount, although the settling defendants' non-tangible cooperation also adds value.

**31.** While *Prudential* cautioned that these factors may have less utility in extremely large settlements, *see* 148 F.3d at 339, this recovery is substantially smaller than *Prudential*'s settlement of more than $1 billion. In any event, these considerations provide a useful starting point, particularly in the absence of other guidelines.

The first factor, likely private fee negotiations, is probably of relatively little weight in a case such as this. *See In re Prudential,* 148 F.3d at 340. However, in private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery. *See, e.g., In re U.S. Bioscience,* 155 F.R.D. at 119 (adopting Special Master's conclusion that thirty percent would likely have been negotiated in securities action); *In re U.S. Bioscience,* Civ. A. No. 92–0678, 1994 WL 485935, at *9–10 (E.D.Pa.1994) (Special Master's report examining practice by attorneys in this district who reported negotiating agreements between 30–40%); *see also In re Merry–Go–Round Enter., Inc.,* 244 B.R. 327 (D.Md. 2000) (holding that forty percent negotiated contingency fee on $185 million settlement was appropriate in bankruptcy context); Mem. in Support of Class Counsel's Joint Pet. for Fees and Expenses at 11 n.12 (citing cases from other districts reaching same conclusion); *but see In re Prudential Ins. Co.,* 962 F.Supp. 572, 586–87 (D.N.J.1997), rev'd, 148 F.3d 283 (stating that Fee Examiner concluded that contingency would be between 10–15% if negotiated privately).

The second factor, awards in other cases, also tends to favor class counsel's request. Percentages awarded have varied considerably, but most fees appear to fall in the range of nineteen to forty-five percent. The median in class actions is approximately twenty-five percent, but awards of thirty percent are not uncommon in securities class actions. *See Computron,* 6 F.Supp.2d at 322; *Ratner v. Bennett,* Civ. A. No. 92–4701, 1996 WL 243645, at *8 (E.D.Pa. May 8, 1996); *In re Greenwich Pharmaceutical Sec. Litig.,* Civ. A. No. 92–3071, 1995 WL 251293, at *6 (E.D.Pa. Apr.26, 1995); *In re Novacare,* 1995 WL 605533, at *9.

The most significant factor in this case is the quality of representation, as measured by "the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *Computron,* 6 F.Supp.2d at 323. All of these considerations favor the thirty percent award.

The first two factors, quality of result and difficulties faced, certainly favor the percentage requested. As described in the foregoing sections, class counsel recovered an extremely large settlement for the plaintiff class. In fact, this is one of the largest, if not the largest, securities fraud settlement in this district. The settlement size is particularly noteworthy as class counsel did not have the benefit of an SEC or other regulatory agency investigation and so prosecuted the case without assistance. The management of the case was also of extremely high quality. As detailed in the affidavit requesting attorneys' fees, class counsel organized the discovery and accompanying document review in an efficient and non-duplicative manner. *See* Joint Decl. ¶¶ 19–32. Equally important are the difficulties faced by class counsel. First, there are inherent, substantial risks entailed in undertaking any contingency fee action. Counsel expended more than 45,000 hours on this case and paid out expenses of more than $3 million with no guarantee of recovery. As a means of highlighting this risk, counsel's Joint Declaration details numerous cases in which similarly high expenditures of time and money went uncompensated following unfavorable results. *See id.* ¶¶ 97–99. In addition, this case presented other significant risks. There were the legal obstacles of establishing scienter, damages, causation, and the like discussed in more detail in the previous sections. The court also acknowledges that securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA. *See, e.g.,* Elliot J. Weiss & Janet Moser, "Enter Yossarian: How to Resolve the Procedural Catch–22 that the PSLRA Creates," 76 Wash. U.L.Q. 457 (1998); Eugene Zelensky, "New Bully on the Class Action Block," 73 Notre Dame L.Rev. 1135 (1998). The Act imposes many new procedural hurdles, including restrictions on the types of plaintiffs who may serve as representatives and requiring increased court intervention in the selection of lead counsel. *See* 15 U.S.C. § 78u–4(a)(2), (3). It also substantially alters the legal standards applied to securities

fraud claims in ways that generally benefit defendants rather than plaintiffs. *See* 15 U.S.C. § 78u–4(b).

The next consideration is the standing and expertise of counsel for both plaintiffs and defendants. First, class counsel is of high caliber and has extensive experience in similar class action litigation. *See* Plf. Compendium of Law Firm Affs. (including resumes of lead and supporting counsel). Each of the co-lead counsel firms has a national reputation for advocacy in securities class actions, and there is no doubt that this standing enhanced their ability both to prosecute the case effectively and to negotiate credibly. Similarly, defense counsel has a fine reputation and has displayed great skill in defending this complex class action. Their opposition to plaintiffs has been anything but token, and many of the battles on crucial issues were hard fought.

Of particular note in assessing the quality of representation is the professionalism with which all parties comported themselves. The submissions were of consistently high quality, and class counsel has been notably diligent in preparing filings in a timely manner even when under tight deadlines. This professionalism was also displayed in class counsel's willingness to cooperate with other counsel when appropriate, such as in the initial stipulation to class certification and in their efforts, along with defense counsel, to draft settlement language that took into account legitimate concerns from other parties, such as E & Y's objections regarding contribution. This cooperation enabled the parties to focus their disputes on the issues that mattered most and to avoid pointless bickering over more minor matters.

Based on the above factors, a thirty percent attorneys' fee is very reasonable. This conclusion is reinforced by the recommended "cross-check" against the lodestar calculation, which may be multiplied to reflect the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation. *See In re Prudential,* 148 F.3d at 340. Up to February 29, 2000, counsel expended 45,080.80 hours on this case, for a total bill of $12,367,680.45. *See* Plf. Compendium of Law Firm Affs. (calculating lodestar until February 29, 2000). After updating their statement, counsel represented that they had expended a total of 47,814 hours for a total bill of $13,178,706.25. *See* Aff. of Jacob Goldberg (updating calculations to March 25, 2000). Each attorney's hourly rates were appropriately calculated by reference to current rather than historic rates. *See, e.g., Grier v. Chase Manhattan Automotive Fin. Co.,* Civ. A. No. 99–180, 2000 WL 175126, at *8 (E.D.Pa. Feb.16, 2000); *In re Novacare,* 1995 WL 605533, at *9. As calculated by class counsel, the initial lodestar would be subject to a multiplier of approximately 2.7 to reach the percentage amount.[32] The hours do not appear to be inflated, and the hourly rates are appropriate. A multiplier of 2.7 is well within the range of those awarded in similar cases, *see, e.g., In re Prudential,* 148 F.3d at 341, particularly given the substantial risk undertaken by class counsel, the large amounts of attorney time and money expended, and the excellent result obtained for the class. The thirty percent award is also supported by the fact that derivative counsel fees will be taken from this amount.[33]

Only one factor would tend to support a smaller percentage: the large size of the settlement fund. Courts have generally decreased the percentage awarded as the amount recovered increases, and $100 million seems to be the informal marker of a "very large" settlement. *See In re Prudential,* 148 F.3d at 339; *In re Computron,* 6 F.Supp.2d at 323; *In re Greenwich,* 1995 WL 251293, at *7. "The basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" *In re Prudential,* 148 F.3d at 339 (quoting *In re First Fidelity Bancorporation Sec. Litig.,* 750

---

32. The court notes that once the updated hours are considered, the multiplier is actually closer to 2.46 than to 2.7.

33. As those counsel did secure an independent benefit for Ikon through the shareholder suit, the court concludes that the $600,000 in fees requested by derivative counsel are appropriate as well.

F.Supp. 160, 164 n. 1 (D.N.J.1990)); *see also In re Greenwich,* 1995 WL 251293, at *7 (suggesting that courts view recovery of large percentages of large settlements as a windfall for attorneys); Third Circuit Task Force 108 F.R.D. at 256 (recommending that percentage decrease as award increases).

While plaintiffs' fee petition catalogs a large number of cases in this district awarding fees of thirty percent or more, none addressed a settlement nearly as large as the one here.[34] A recent Third Circuit discussion suggested that very large recoveries have generally yielded fees from 4.1 percent to 17.92 percent, but the cases cited in that decision were all decided at least thirteen years ago. *See In re Prudential,* 148 F.3d at 339 n. 118; *see also In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,* 886 F.Supp. 445, 462 & n. 33 (E.D.Pa.1995) (collecting cases and stating that average recovery is between four to ten percent; no case evaluated was decided after 1987). In contrast, an Eastern District of Texas case analyzed much more recent "megafund" cases and found the average award to be approximately fifteen percent. *See Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F.Supp.2d 942, 971–73 (E.D.Tex.2000) (awarding $150.5 million in costs and fees for settlement valued at approximately $1 billion).

There are, nonetheless, courts that have simply declined to adjust the "standard" percentage, even in the face of a huge recovery. In *In re Sumitomo Copper Litigation,* 74 F.Supp.2d 393 (S.D.N.Y.1999), counsel obtained a settlement of $134.6 million of which $116 million was fee compensable. *See id.* at 394. The court ultimately awarded fees of $32,065,000, constituting 27.5% of the total; the multiplier from the lodestar was approximately 2.5. *See id.* at 399–400. While *Sumitomo* stressed the unique difficulties entailed in that price-fixing claim, many of the same organizational challenges faced plaintiffs here: like the *Sumitomo* counsel, they expended hundreds of thousands of dollars in expenses, they had to develop an extensive computer data-base to handle the information, and they had no government agency action to assist them. Similarly, in *Kurzweil v. Philip Morris Companies, Inc.,* Civ. A No. 94–2373, 2546, 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999), the court awarded attorneys' fees of $37,146,029.39, constituting thirty percent of a $123,820,097.97 fund. *See id.* at *1. That award applied a 2.46 multiplier. *See id.* at *2. *See also In re Lease Oil Antitrust Litig.,* 186 F.R.D. 403, 447–48 (S.D.Tex.1999) (acknowledging general practice of reducing percentage for large settlements but awarding 25% fee of $190 million fund); *In re Combustion, Inc.,* 968 F.Supp. 1116, 1131–41 (W.D.La.1997) (awarding maximum reserve of 36% fee from $127 million fund).

In the end, like the courts in *Sumitomo* and *Kurzweil,* this court can see no principled basis for reducing the requested award by some arbitrary amount: there is no particular reason why twenty-five percent of a $111 million settlement is more appropriate than is thirty percent, particularly in light of the hours expended on this case. The court will not reduce the requested award simply for the sake of doing so when every other factor ordinarily considered weighs in favor of approving class counsel's request of thirty percent. *See Kurzweil,* 1999 WL 1076105, at *3.

In so ruling, the court is well aware that most decisions addressing similar settlement amounts have adopted some variant of a sliding fee scale, by which counsel is awarded ever diminishing percentages of ever increasing common funds. *See generally, In re Unisys Corp.,* 886 F.Supp. at 463 (exhaustively analyzing attorneys' fees case law and theory and ultimately applying hybrid approach to award 6.25% of $111 million fund);

---

**34.** Many of the cases cited were not published or reported on Westlaw or Lexis. However, the cases that were included addressed recoveries of $875,000, *see Blackman,* 1999 WL 397389, at *1 (35%); $1,057,906, *see In re Valuevision Int'l Sec. Litig.,* 957 F.Supp. 699, 700 (E.D.Pa.1997) (34%); $400,000, *see Ratner,* 1996 WL 243645, at *1 (35%); $5.2 million in cash and $10 million in securities, *see In re U.S. Bioscience,* 155 F.R.D. at 117 (30% award); $4.375 million, *see In re Greenwich,* 1995 WL 251293, at *1 (33.3%); $1.2 million, *see AAMCO Auto. Transmissions, Inc. v. Tayloe,* 82 F.R.D. 405, 407 (E.D.Pa.1979) (over 40%, although only a small portion came from the settlement fund); and $260,000 and an injunction. *See Zinman v. Avemco Corp.,* Civ. A. No. 75–1254, 1978 WL 5686, at *1 (E.D.Pa. Jan.18, 1978) (50%).

*see also In re Chambers Dev.*, 912 F.Supp. at 858–62 (applying sliding scale for ultimate award of 21.6% of $95 million fund). This court respectfully concludes that such an approach tends to penalize attorneys who recover large settlements. More importantly, it casts doubt on the whole process by which courts award fees by creating a separate, largely unarticulated set of rules for cases in which the recovery is particularly sizable. It is difficult to discern any consistent principle in reducing large awards other than an inchoate feeling that it is simply inappropriate to award attorneys' fees above some unspecified dollar amount, even if all of the other factors ordinarily considered relevant in determining the percentage would support a higher percentage. *See, e.g., In re Unisys*, 886 F.Supp. at 462 ("Awarding 20 to 45 percent of the $111 million fund in this case would be manifestly unjust[.]").[35] Such an approach also fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery. Nor does it give sufficient weight to the fact that "large attorneys' fees serve to motivate capable counsel to undertake these actions." *In re Gen. Motors*, 55 F.3d at 801.

In the end, the facts are these: Class counsel did a remarkable job of representing the class interests. In so doing, they expended huge amounts of time and money, and faced considerable risks of non-recovery. They also settled expeditiously with very few objectors. An award of thirty percent of the net settlement fund, which comes to approximately 28.4 percent of the gross settlement fund after deducting costs and considering that the derivative counsel fees and costs will come out of this award, is eminently reasonable and fair. The court awards counsel fees of $32,404,744.33.[36]

**C. Requested Attorneys' Fees by Objectors**

█ HSA requests attorneys' fees of $97,531.50 plus reimbursement of $7,270.68 in expenses for its efforts regarding the minimum check amount. Objectors are not ordinarily entitled to counsel fees. *See, e.g., In re Prudential*, 962 F.Supp. at 593; *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 358 (N.D.Ga.1993); *Frankenstein v. McCrory Corp.*, 425 F.Supp. 762, 767 (S.D.N.Y.1977). However, if the objection confers a benefit on the class or assisted the court by sharpening debate, fees may be appropriate. *See, e.g., Shaw*, 91 F.Supp.2d 942, 973–74; *In re Domestic Air Transp.*, 148 F.R.D. at 359; *Frankenstein*, 425 F.Supp. at 767.

The HSA objectors did not confer any benefit on the class as a whole, as their objection led to a relatively minor reshuffling of disbursements that will allow some individuals to receive a very small award while simultaneously reducing the award payable to others. They did sharpen debate on a relatively marginal issue with which class counsel probably agreed. A fair and reasonable fee for this service is $10,000, and it is also appropriate to reimburse their costs. These fees and costs will be taken from class counsel's award to avoid dilution of the settlement fund.

**VI. Conclusion**

The settlements produced in the securities action and the related derivative suit are fair and reasonable, and there are no objections that require rejection of the proposed settlements. Attorneys' fees constituting thirty percent of the net settlement fund are warranted, and objector HSA will be given costs and $10,000 in fees.

Appropriate orders follow.

---

**35.** *In re Prudential* does not require a contrary result. The district court there awarded $90 million in attorneys' fees on a settlement estimated to be worth more than $1 billion. While the Third Circuit's decision reversing this award did note that larger settlements usually receive smaller attorneys' fees percentages, much of its concern was case specific. In particular, the court questioned such a large fee when much of the settlement resulted from a Task Force and the work of state regulators. *See In re Prudential*, 148 F.3d at 342.

**36.** Also, the effective marginal award for the amount of the settlement fund over $100 million, which is $11,841,312.29, is actually approximately twenty percent once costs and derivative fees are deducted.

## ORDER

AND NOW, this 9th day of May, 2000, upon consideration of all information and argument submitted with respect to the petition of plaintiffs' counsel for an award of attorneys' fees and reimbursement of expenses incurred in prosecuting the above-captioned action, following notice to the Class and a hearing held on April 11, 2000, it is hereby **ORDERED** that the petition is **GRANTED** as follows:

(1) Plaintiffs' counsel are awarded counsel fees in the amount of $32,404,744.33 (the "Fee Award"), which constitutes thirty percent of the net settlement fund as of April 13, 2000 ($111,841,312.29, less $3,825,497.86 of expenses incurred by plaintiffs' counsel). The thirty percent fee requested is fair and reasonable when considered under applicable standards and is well within the normal range of awards made in contingent fee matters of this type, particularly in view of the substantial risks attendant in bringing and pursuing this action and the results achieved. Plaintiffs' counsel are further awarded interest on the Fee Award from April 14, 2000 until the date of payment of the Fee Award, at the same rate or rates of interest earned by the settlement fund.

(2) Plaintiffs' counsel are awarded reimbursement for expenses incurred in the prosecution and settlement of this action in the amount of $3,525,497.86, which constitutes total expenses of $3,825,497.86, less $300,000 of expenses associated with mailing of the notice of proposed settlement, already paid from the settlement fund.

(3) There is no just reason for delay in the entry of judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, and the Clerk is hereby directed to enter judgment in accordance with this Order.

(4) Certification under Rule 54(b) will not result in unnecessary appellate review, nor will review of the adjudicated claims moot any further developments in this action. Even if appeals are subsequently filed, the nature of these claims are such that the appellate court would not have to decide the same issue more than once.

(5) All objections to Class Counsel's Joint Petition for Fees and Reimbursement of Expenses are overruled and denied in all aspects.

## ORDER

AND NOW, this 9th day of May, 2000, upon consideration of all information submitted supporting the Plan of Allocation as detailed in the Stipulation and Agreement of Settlement and the Notice of Pendency of Class Action, Proposed Settlement and Hearing Thereon, and upon consideration of all objections, thereto, it is hereby ORDERED that the Plan of Allocation, as proposed by Lead Plaintiffs and Co–Lead Counsel, is hereby APPROVED as follows, and all proceeds of the partial Settlement, after deduction of attorneys' fees and costs and interest thereon, shall be distributed in accordance therewith:

(a) For Plan of Allocation purposes, "IKON Securities" are defined as common stock or convertible preferred stock of Alco Standard Corp. and/or IKON Office Solutions, Inc., or the publicly traded call options on the common stock of Alco Standard Corp. and/or IKON Office Solutions, Inc. during the period from January 24, 1996 through and including August 13, 1998.

(b) Each Authorized Claimant shall receive, on a pro rata basis, that share of the Net Settlement Fund that the Authorized Claimant's Recognized Claim bears to the total Recognized Claims of all Authorized Claimants in accordance with the formula set forth below in subparagraphs (c) and (d). For the purpose of that formula, "Calculated Loss" means the purchase price less the sale price. For common shares that are held on or after August 13, 1998, the "Calculated Loss" will be calculated based upon an assumed sale price of $9.9375 per share (the closing price on August 14, 1998). For shares of convertible preferred stock that are held on or after August 13, 1998, the "Calculated Loss" will be calculated based upon an assumed sale price of $26.00 per share (the closing price on August 14, 1998). For call options that are held in open long positions on or after August 13, 1998, the "Calculated Loss" will be calculated based upon an as-.

sumed sale price equivalent to the closing prices for the same series of call options on August 14, 1998.

(c) With respect to Authorized Claimants who did not acquire the IKON Securities in connection with the sale of a business to IKON on or after May 10, 1997, and Authorized Claimant's Recognized Claim shall be determined as follows:

(1) For IKON Securities purchased or otherwise acquired between January 24, 1996 and January 15, 1997, inclusive, and sold on or before April 21, 1998, Recognized Claim is five percent (5%) of Calculated Loss;

(2) For IKON Securities purchased or otherwise acquired between January 24, 1996 and January 15, 1997, inclusive and held beyond April 21, 1998, Recognized Claim is 25% of the Calculated Loss;

(3) For IKON Securities purchased or otherwise acquired between January 16, 1997 and April 21, 1998, inclusive, and sold before April 21, 1998, Recognized Claim in 10% of Calculated Loss;

(4) For IKON Securities purchased or otherwise acquired between January 16, 1997 and April 21, 1998, inclusive, and held beyond April 21, 1998, Recognized Claim is 100% of Calculated Loss;

(5) For IKON Securities purchased or otherwise acquired and sold between April 22, 1998 and June 26, 1998, inclusive, Recognized Claim is 10% of Calculated Loss;

(6) For IKON Securities purchased or otherwise acquired between April 22, 1998 and June 26, 1998, inclusive, and held on or after June 29, 1998, Recognized Claim is 100% of Calculated Loss;

(7) For IKON Securities purchased or otherwise acquired and sold between June 29, 1998 and August 13, 1998, inclusive, Recognized Claim is 10% of Calculated Loss;

(8) For IKON Securities purchased or otherwise acquired from June 29, 1998 and held on or after August 14, 1998, Recognized Claim is 100% of Calculated Loss.

(d) Notwithstanding anything above, for an Authorized Claimant who purchased or acquired call options, for allocation purposes, Recognized Claim shall be determined by multiplying the Recognized Claim, as it would be determined in subparagraph (c) above, by 0.5.

(e) For an Authorized Claimant, who acquired the IKON Securities through the sale of his/her/its business to IKON for IKON Securities on or after May 7, 1997, for allocation purposes, Recognized Claim shall be determined by multiplying the Recognized Claim as it would be determined in subparagraph (c) above by 1.5. For purposes of this calculation the purchase price per share shall be the price or value stated to be the price of the IKON Securities in the contract of sale, or if the contract does not specify such price, then the average market price for the IKON Securities for the ten (10) business days preceding the closing date of the sale.

(f) Purchases and sales of IKON Securities shall be matched based on the assumption that the first share purchased during the Class Period was the first share sold during the Class Period. The date of purchase or sale is the "contract" or "trade" date as distinguished from the "settlement date." "Short" sales shall not be recognized for any amount of loss on the cover or purchase transaction. Gains on transactions in any of the IKON Securities will be deducted from Calculated Losses. In the interest of economy, no payment shall be made to any Authorized claimant whose Payable Claim would be less than $5.

### ORDER

**AND NOW**, this 9th day of May, 2000, upon consideration of all information and argument submitted with respect to the petition of derivative plaintiff's counsel for an award of fees for services rendered and reimbursement of expenses incurred in prosecuting the above-captioned derivative action (including the Affidavit of Jerold Hoffman, counsel for derivative plaintiff, included in the Compendium of Time and Expense Affidavits in Support of Application for an Award of Attorney's Fees and Reimbursement of

Expenses, which counsel filed in the above-captioned Class Action), and following notice to the shareholders of IKON Office Solutions, Inc., and a hearing held on April 11, 2000, it is hereby **ORDERED** that the petition is **GRANTED** as follows:

(1) Derivative plaintiff's counsel shall be paid fees and expenses from such fees and expenses as are awarded by the court in the above-captioned Class Action.

(2) Derivative plaintiff shall not receive any award of fees and expenses from defendants or from the nominal defendant in the derivative action except for the payment described in the preceding paragraph.

### ORDER

AND NOW, this 9th day of May, 2000, on the Petition for Attorney's Fees and Costs (the "Petition") filed by Objector Hogan, Smith & Alspaugh ("HSA"), both HSA and the Class plaintiffs having submitted papers with respect to the Petition, it is hereby ORDERED as follows:

1. HSA shall be paid the sum of $10,000 with respect to attorney's fees and $7,270.68 with respect to reimbursement of expenses, for a total of $17,270.68.

2. Payment as specified in paragraph 1 above shall be made to HSA by counsel for Class plaintiffs not more than thirty (30) days after the Court's Order becomes final with respect to the application of counsel for Class plaintiffs for payment of attorney's fees and reimbursement of expenses.

3. Except as provided in paragraphs 1 and 2 above, HSA shall receive no payment with respect to, or in connection with, the Petition or any of the objections it has asserted with respect to the proposed partial settlement of this litigation as to the IKON defendants.

### ORDER

**AND NOW,** this 9th day of May, 2000, a Hearing having been held before this Court on April 11, 2000, pursuant to this court's Order of December 30, 1999 (the "Preliminary Order"), on the Settlement set forth in the Stipulation and Agreement of Settlement dated December 22, 1999 (the "Stipulation" or the "Settlement"), which Stipulation is incorporated herein by reference; it appearing that due notice (the "Notice") of said Hearing was given in accordance with the Preliminary Order; the respective parties having appeared by their respective attorneys, and such attorneys having been heard; no person or entity having objected to the Stipulation or to the terms of settlement of the Settled Derivative Claims as set forth in the Stipulation, the Settlement having been considered by the Court, and the Court having made its findings of fact and conclusions as set forth below;

It is hereby ORDERED as follows:

1. Capitalized terms used herein and not otherwise defined shall have the same meaning as set forth in the Stipulation.

2. The form and manner of Notice given to Shareholders of IKON Office Solutions, Inc. ("IKON" or "the Company") are hereby determined to have been the best notice practicable under the circumstances and constitute due and sufficient notice to all persons entitled to receive such notice in compliance with the provisions of Rule 23.1 of the Federal Rules of Civil Procedure and the requirements of due process.

3. Pursuant and subject to the provisions and conditions of Paragraph 4(a) of the Stipulation, this action is properly maintained as a derivative action under Rule 23.1 of the Federal Rules of Civil Procedure on behalf of IKON and Plaintiff Andrew J. Karcich Custodian for Andrew J. Karcich–UGMA NJ is an appropriate derivative plaintiff.

4. The Settlement, as provided for in the Stipulation, is approved as fair, reasonable and adequate and in the best interests of IKON and its Shareholders and shall be consummated in accordance with the terms and conditions of the Stipulation.

5. All claims that have been or could have been asserted in the Complaint derivatively by Plaintiff in the Action or by any other holder of IKON stock against any of the Defendants, Reliance Insurance Company, and each and every former and present employee, director, officer, agent and counsel of Defendants and IKON, and their heirs, rep-

resentatives, executors, administrators, subsidiaries, successors and assigns, in connection with, or in any way respecting any act, failure to act, omission, representation, fact, event, course of conduct, transaction, occurrence, claim, or other matter alleged or which could have been alleged in the Complaint including, but not limited to, claims for breach of fiduciary duty, breach of IKON's policies or procedures, waste, mismanagement, violations of law, money damages, or other relief, but excluding any claims arising out of the purchase of any security issued by IKON which claims are the subject of the Second Amended Consolidated Class Action Complaint which is the operative pleading in the Class Action and excluding any claims against Ernst & Young LLP, shall hereby be compromised, settled, released, discharged and dismissed with prejudice upon entry of this Order and Final Judgment of Dismissal.

6. If this Order and Final Judgment of Dismissal does not become effective, the Derivative Settlement Amount and any interest earned thereon, shall be returned to Reliance Insurance Company within seven (7) days after the matter is remanded to this Court.

The Court finds, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that this Order of Final Judgment of Dismissal is a final judgment for purposes of appeal, there being no just reason for delay in the entry of a final judgment, notwithstanding others matters presently pending, if any, and the Clerk is hereby directed to enter judgment herein.

### FINAL JUDGMENT OF DISMISSAL WITH PREJUDICE AS TO CERTAIN DEFENDANTS

Lead Plaintiffs and Settling Defendants, as those terms are defined in the Stipulation and Agreement of Settlement dated December 22, 1999, (the "Stipulation"), having executed and filed the Stipulation; the Court having entered its Preliminary Approval Order thereon on December 30, 1999, directing that notice of the proposed settlement of the Litigation (as defined below and in the Stipulation) be mailed to the members of the Global Class (as defined below) and scheduling a hearing to be held to determine, among other things, whether the proposed settlement should be approved as fair, reasonable and adequate, said notice having been given; a hearing having been held on April 11, 2000, at which all interested persons were given an opportunity to be heard; and the Court having read and considered all submissions in connection with the proposed settlement, and having reviewed and considered the files and records herein, the Court finds and concludes that:

The above-captioned action (the "Litigation") was commenced in August 1998, and the Second Amended Consolidated Class Action Complaint (the "SAC") was filed on August 4, 1999.

The SAC alleges claims for violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b–5 of the rules and regulations of the Securities and Exchange Commission, section 20(a) of the Exchange Act, Sections 11 and 12(2) of the Securities Act of 1933 (the "Securities Act") and common law. On March 15, 1999, the Court entered an Order approving the Parties' Stipulation Concerning Class Certification, thereby certifying a class (the "Certified Class") as follows:

All persons who purchased or otherwise acquired common stock and/or call options of Alco Standard Corp. and/or Ikon Office Solutions, Inc. during the period from January 1, 1997 through and including August 13, 1998; or "when issued" common stock of Alco Standard Corp. during the period from December 9, 1996, through and including December 31, 1996; or convertible preferred stock of Alco Standard Corp. and/or Ikon Office Solutions, Inc. during the period from December 16, 1996 through and including August 13, 1998. Excluded from the Class are defendants, the officers and directors of IKON, members of the immediate families of such officers and directors, and subsidiaries and affiliates of the defendants.

For purposes of settlement, the Lead Plaintiffs and Settling Defendants agreed and stipulated, subject to approval of the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, that the following class (the "Settlement Class") shall be certi-

fied conditionally for purposes of settlement only under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure:

a. all persons who purchased or otherwise acquired common stock, convertible preferred stock, and/or call options of Alco Standard Corp. and/or IKON during the period from January 24,- 1996 through and including August 13, 1998 other than the members of the Certified Class who do not timely exclude themselves from the Settlement Class; and

b. all persons who excluded themselves from the Certified Class but who, pursuant to the Settlement, request inclusion in the Settlement Class for the purpose of being able to participate in the Settlement.

The Stipulation between and among the Lead Plaintiffs and Settling Defendants provides for the settlement of the Litigation on behalf of the Lead Plaintiffs and all members of the Global Class (which includes both the members of the Certified Class and the members of the Settlement Class) with the Settling Defendants subject to approval by this Court of its terms and to the entry of this Order and Final Judgment. The Court scheduled a hearing to consider the approval of the Stipulation, and directed that notice of the proposed settlement and hearing be mailed to members of the Global Class.

In accordance with the Stipulation, and an Order of the Court entered on December 30, 1999, Lead Plaintiffs mailed to the Global Class a notice (the "Notice") dated January 14, 2000, and caused a summary notice (the "Summary Notice") to be published in the national edition of *The Wall Street Journal* and the Notice to be published electronically on a suitable internet site of the proposed settlement of the Litigation and of the opportunity to object to the Settlement. Affidavits and/or declarations regarding the dissemination of the Notice and publication of the Summary Notice were filed with the Court on March 7, 2000.

The Notice and Summary Notice provided to Global Class Members constitute the best notice practicable under the circumstances and include individual notice to all members of the Global Class who could be identified by reasonable effort. The affidavits or declarations filed with this Court on March 7, 2000, demonstrate that this Court's Order with respect to the Notice and Summary Notice has been complied with and further, that the best notice practicable under the circumstances was in fact given and constituted valid, due, and sufficient notice to members of the Global Class, complying fully with due process, Rule 23 of the Federal Rules of Civil Procedure, and section 21(D)(a)(7) of the Exchange Act, 15 U.S.C. § 78u–4(a)(7) as amended by the Private Securities Litigation Reform Act of 1995.

Lead Plaintiffs and the Settling Defendants have applied to the Court for approval of the terms of the Stipulation and for the entry of this Order and Final Judgment. Pursuant to the Notice and Summary Notice, and upon notice to all parties, a hearing was held before this Court on April 11, 2000, to consider, among other things, whether the settlement set forth in the Stipulation should be approved by this Court as fair, reasonable, and adequate.

Approval of the Stipulation will result in substantial savings in time and money to the Court and the litigants and will further the interests of justice.

The Stipulation is the product of good faith arms'-length negotiations by the parties thereto.

NOW THEREFORE, GOOD CAUSE APPEARING THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1. The definitions set forth in the Stipulation are incorporated herein.

2. The members of the Settlement Class who have filed timely and valid requests for exclusion are not bound by this Order and Final Judgment. The members of the Certified Class who filed request for exclusion from the Certified Class, and who have not requested to be included in the Settlement Class, are not bound by this Order and Final Judgment. A listing of those persons is at-

tached hereto as Exhibit A. The persons and entities who previously excluded themselves from the Certified Class and who submitted requests to be included in the Settlement Class are listed on Exhibit B hereto* and they are hereby included in the Settlement Class and are bound by this Order and Final Judgment.

3. Except for the persons listed on Exhibit A, all persons and entities (other than Settling Defendants, members of the immediate families of the Individual Defendants, any parent, subsidiary, affiliate, officer or director of IKON, and its subsidiaries and affiliates, any entity in which any excluded person has a controlling interest and the legal representatives, heirs, successors and assigns of any excluded person) who purchased or otherwise acquired IKON Securities at any time from January 24, 1996 through and including August 13, 1998 are bound by this Order and Final Judgment and by the Stipulation, including the releases provided for in this Order and Final Judgment.

4. Neither the Stipulation nor the Settlement is an admission by the Settling Defendants, or the Lead Plaintiffs or the Global Class, nor is this Order and Final Judgment a finding with respect to the validity or invalidity of any claims or defenses in the Litigation or of any wrongdoing, or lack thereof, by Settling Defendants or that the Settling Defendants' defenses are or are not meritorious. Furthermore, neither the Stipulation nor the Settlement is a concession by any Settling Defendant, or by any Lead Plaintiff or any member of the Global Class, and neither shall be used as an admission of any fault or omission, or lack thereof, by any person. Neither this Order and Final Judgment, the Stipulation nor any document referred to herein, nor any action taken to carry out this Stipulation is, may be construed as, or may be used as an admission by or against the Settling Defendants, the Lead Plaintiffs, or any member of the Global Class of any fault, wrongdoing or liability whatsoever, or of any lack thereof. Entering into or carrying out the Stipulation, and the Exhibits thereto, and any negotiations or proceedings related thereto shall not in any event be construed as, or deemed to be evidence of, an admission or concession with regard to the denials or defenses of any of the Settling Defendants, or the claims of any of the Lead Plaintiffs or the Global Class, and shall not be offered or received in evidence in any action or proceeding against Lead Plaintiffs or the Settling Defendants in any court, administrative agency or other tribunal for any purpose whatsoever, other than to enforce the provisions of this Order and Final Judgment, the Stipulation, or any related agreement or release; except that the Stipulation and the Exhibits may be filed in this Litigation or related litigation as evidence of the Settlement or in any subsequent action against or by Lead Plaintiffs, Settling Defendants, any Released Parties, any member of the Global Class or any counsel thereto, to support a defense of *res judicata*, collateral estoppel, release, or other theory of issue preclusion or similar defense. Nothing in the provisions of this paragraph shall be interpreted to prevent E & Y from offering, or upon such offer a court or any adjudicative forum or tribunal from exercising its discretion as to whether to admit, any evidence that is otherwise admissible under the applicable rules of evidence, including but not limited to Federal Rule of Evidence 408. In the event such an offer of evidence is made in a case in which the Plaintiffs are parties, Plaintiffs may oppose such offer.

5. The Stipulation and the Settlement are fair, reasonable and adequate as to the Global Class, and the Stipulation and the Settlement are hereby finally approved in all respects, and Lead Plaintiffs or Settling Defendants are hereby directed to consummate and perform its terms.

6. The Litigation,[1] and each individual action which is a part hereof, is dismissed with

---

1. The Litigation includes the following individual actions: (1) *Cohen v. IKON Office Solutions, Inc.*, E.D. Pa, Civil Action No. 98cv4286 (MK), filed August 14, 1998; (2) *Goldfein v. Ikon Office Solutions, Inc.*, E.D. Pa, Civil Action No. 98cv4339, filed August 18, 1998; (3) *Brody v. Ikon Office Solutions, Inc.*, E.D. PA, Civil Action No. 98cv4331, filed August 18, 1998; (4) *Bronstein v. Ikon Office Solutions, Inc.*, E.D. PA, Civil Action No. 98cv4372, filed August 19, 1998; (5) *Carroz-*

prejudice as to the Settling Defendants and without costs to any party as against any other, and Lead Plaintiffs and each member of the Global Class shall release and discharge Settling Defendants and Reliance Insurance Company, and any and all of their former and present parents, subsidiaries, affiliates, partners, employees, directors, officers, agents, accountants (other than Ernst & Young LLP), attorneys, and all of their respective predecessors, successors, assigns, agents, heirs, representatives, executors and administrators (collectively, the "Released Parties") from the "Settled Claims," which is defined as all claims, demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, asserted or that might have been asserted, including, without limitation, claims for negligence, gross negligence, fraud, negligent misrepresentation, breach of fiduciary duty, or violations of any state or federal statutes, rules or regulations, by any Lead Plaintiff or Global Class member against Settling Defendants or Released Parties arising out of, relating to, or in connection with purchases or acquisitions by any other means, directly or indirectly, of IKON Securities at prices which are alleged to have been wrongfully inflated during the Class Period from January 24, 1996 through and including August 13, 1998—or arising out of or relating to any of the acts, omissions, misrepresentations, facts, events, matters, transactions or occurrences referred to in any of the complaints filed in the Litigation or the Derivative Action or otherwise alleged, asserted or contended in the Litigation or Derivative Action as having wrongfully inflated the market price of IKON Securities; provided, however-

er, Settled Claims shall not include: (a) any claim that, in connection with a Global Class member's sale of his or her business to IKON in return in whole or in part, for securities, IKON breached its contract with the Global Class member by failing to perform any of its obligations, except that a claim alleging that there was a wrongful inflation of the price of IKON Securities is a Settled Claim; (b) any claim that IKON or other Released Parties violated duties to any IKON employee who is a Global Class member, except that such claims are Settled Claims insofar as the injury alleged is that the Global Class member or a trust or other ERISA related entity of which the Global Class member is a beneficiary or participant was caused to acquire or did acquire, directly or indirectly, IKON Securities at wrongfully inflated prices during the Class Period; and (c) any claims, demands, rights, liabilities, and causes of action, of any nature and description whatsoever, that are asserted or that could have been asserted by a Lead Plaintiff or Global Class member against Ernst & Young LLP, or any of its predecessors, successors, affiliates, partners, principals or employees. Lead Plaintiffs, and each of them, on their own behalf and on behalf of the Global Class, expressly waive the provisions of Section 1542 of the California Civil Code (and all other like provisions of law in any other jurisdiction) which provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

za v. Ikon Office Solutions, Inc., E.D. PA, Civil Action No. 98cv4355, filed August 19, 1998; (6) Kaplan v. Ikon Office Solutions, Inc., E.D. PA, Civil Action No. 98cv4377, filed August 20, 1998; (7) DiMaggio v. Ikon Office Solutions, Inc., E.D. PA, Civil Action No. 98cv4532, filed August 24, 1998; (8) Sharpe v. Ikon Office Solutions, Inc., E.D. PA, Civil Action No. 98cv4542, filed August 24, 1998; (9) Orrock v. Ikon Office Solutions, Inc., E.D. PA, Civil Action No. 98cv4543, filed August 24, 1998; (10) Jaroslawicz v. Ikon Office Solutions, Inc., E.D. PA, Civil Action No. 98cv4606, filed September 1, 1998; (11) Watson v. Ikon Office Solutions, Inc., E.D. PA, Civil Action No. 98cv4703, filed September 2, 1998; (12) Hughes v. Ikon Office Solutions, Inc. E.D. PA,

Civil Action No. 98cv4721, filed September 3, 1998; (13) Davus v. Ikon Office Solutions, Inc., E.D. PA, Civil Action No. 98cv4848, filed September 11, 1998; (14) City of Philadelphia v. Ikon Office Solutions, Inc., E.D. PA, Civil Action No. 98cv5483, filed October 16, 1998.

As used in this Order and Final Judgment, the term "Litigation" refers to the actions listed above, but does not refer to or include Whetman v. IKON Office Solutions, Inc., C.A. No. 2:98–89, or Wallis v. IKON Office Solutions, Inc., C.A. No. 2:98–980. To the extent that the Whetman and/or the Wallis actions assert claims that are Settled Claims, those claims will be released by all members of the Global Class herein.

7. On the Effective Date, as defined in the Stipulation, the Settling Defendants shall be deemed to release and discharge Lead Plaintiffs, counsel for plaintiffs and all members of the Global Class unconditionally and forever from all claims, rights, liabilities and causes of action in connection with the institution, prosecution or resolution of this Litigation or the Settled Claims.

8. On the Effective Date, as defined in the Stipulation, the members of the Global Class shall be deemed unconditionally and forever to release and discharge Lead Plaintiffs and counsel for plaintiffs and all members of the Global Class from all claims, liabilities and causes of action in connection with Lead Plaintiffs' institution, prosecution or resolution of this Litigation or the Settled Claims.

9. On the Effective Date, as defined in the Stipulation, each member of the Global Class who has not timely and validly requested exclusion shall be deemed conclusively to have released the Settled Claims against the Settling Defendants and the Released Parties, notwithstanding that the Lead Plaintiffs and/or members of the Global Class may hereafter discover facts in addition to or different from those which the Lead Plaintiffs or members of the Global Class now know or believe to be true with respect to the Litigation and the Settled Claims or to the subject matter of the releases herein described. Each Lead Plaintiff and member of the Global Class shall be deemed, upon the Effective Date, to fully, finally and forever settle and release any and all Settled Claims against the Settling Defendants and the Released Parties, including all claims known or unknown, suspected or unsuspected, contingent or non-contingent, which now exist, may hereafter exist, or heretofore have existed, and without regard to the subsequent discovery or existence of different or additional facts.

10. Each member of the Global Class who did not timely and validly request exclusion is barred and permanently enjoined from commencing and prosecuting, either directly, representatively, or in any other capacity, against the Settling Defendants and the Re-leased Parties, any and all of the Settled Claims.

11. All claims for contribution against Settling Defendants by non-settling defendants or any person claiming by or through a non-settling defendant which are based upon or relate to or arise out of the Settled Claims, this Litigation or the Settlement of this Litigation are forever barred and the filing of any such claim, whether in this Litigation or in any other court, arbitration, administrative agency or proceeding in any other forum, is hereby enjoined; and all claims for contribution against non-settling defendants by Settling Defendants or any person claiming by or through a Settling Defendant which are based upon, or relate to or arise out of the Settled Claims, this Litigation or the Settlement of this Litigation are forever barred and the filing of any such claim, whether in this Litigation or in any other court, arbitration, administrative agency or proceeding in any other forum, is hereby enjoined. Notwithstanding the dismissal of the Settling Defendants, if plaintiffs or any other person or entity secure a verdict or judgment against any non-settling defendant in any action to which this bar order applies, the verdict or judgment shall be reduced by the greater of (i) an amount that corresponds to the percentage of responsibility of the Settling Defendants; or (ii) the amount paid to plaintiffs by the Settling Defendants.

12. Members of the Certified Class and the Settlement Class who have validly and timely requested exclusion (and who have not thereafter requested inclusion) may pursue their own individual remedies, if any.

13. The Court reserves jurisdiction, without affecting the finality of this Order and Final Judgment, over: (a) implementation and enforcement of this Settlement and the Stipulation and any award or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Settlement Fund; (c) approval of the Plan of Allocation of the Settlement Fund; (d) the application of plaintiffs counsel for the award of attorneys fees and expenses; (e) enforcement and administration of the Stipulation including any releases executed in connection

therewith; and (f) other matters related or ancillary to the foregoing.

14. All objections to the Settlement are overruled and denied in all respects.

15. This Court has jurisdiction over the subject matter of this Litigation, and all acts within this Litigation, and over all parties to this Litigation, including all members of the Global Class.

16. In the event that the Settlement does not become effective or is canceled or terminated in accordance with the terms and provisions of the Stipulation, then this Order and Final Judgment shall be rendered null and void and be vacated and all orders entered in connection therewith by this Court shall be rendered null and void.

17. The costs and expenses associated with the consummation and/or administration of the Settlement shall be paid pursuant to the terms of the Stipulation.

18. There is no just reason for delay in the entry of judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, and the Clerk is hereby directed to enter judgment in accordance with this Order and Final Judgment.

19. Entry of this Order and Final Judgment and final approval of the Settlement as against the Settling Defendants settles all claims that have been asserted or could have been assert in this Litigation.

20. The Court finds that each party and each attorney representing any party has complied with the requirements of Rule 11 of the Federal Rules of Civil Procedure.

21. Certification under Rule 54(b) will not result in unnecessary appellate review, nor will review of the adjudicated claims moot any further developments in the Litigation. Even if appeals are subsequently filed, the nature of these claims are such that the appellate court would not have to decide the same issue more than one. The reservation of jurisdiction by this court pursuant to the following paragraph shall not affect in any way the finality of this Order and Final judgment.

22. Without in any way affecting the finality of this Order and Final Judgment, this Court shall retain continuing jurisdiction over the Litigation and the parties to the Settlement to enter any future orders as may be necessary for the purposes of effectuating the Settlement and enforcing this Order and Final Judgment.